## Jursic, Appellant, *v.* Pittsburgh & Lake Erie Railroad Company.

Argued October 13, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*Theodore M. Tracy,* with him *H. Y. Crossland* and *Evans, Ivory & Evans,* for appellant.

*Chauncey Pruger,* with him *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 12, 1954:

This case arose out of a railroad crossing accident. Plaintiff sued to recover for personal injuries sustained and damage to his Dodge pick-up truck when it was struck by a freight train on the eastbound main line track of the defendant, Pittsburgh & Lake Erie Railroad Company, at the Sheridan Street grade crossing in the City of McKeesport. A jury returned a verdict for the plaintiff in the sum of $5,000. The defendant filed motions for new trial and for judgment non obstante veredicto. While expressing the opinion that it considered the verdict excessive, the lower court refused the motion for new trial because of its grant of the motion for judgment n.o.v. This appeal is from the judgment accordingly entered for the defendant.

The defendant railroad company maintains two sets of tracks which run east and west and cross Sheridan Street which runs north and south. North of the defendant's tracks but separated by a paved area about 30 feet wide, very much like a street, are three tracks of the Baltimore & Ohio Railroad Company which also run east and west and cross Sheridan Street. The latter are protected by wooden warning gates which were open or up at the time of the accident. At about 6:12 in the morning of February 8, 1950 plaintiff was driving his truck southwardly on

Sheridan Street toward the National Tube Mill, located south of defendant's tracks, where he was employed as a laborer. It was dark. Plaintiff testified that he intended to park his car in an adjacent area (also described as a street) between the defendant's tracks and the mill; that he stopped, looked and listened before crossing the Baltimore & Ohio tracks and that after crossing the paved area between the Baltimore & Ohio and defendant's tracks, again stopped, looked and listened before crossing the defendant's tracks; that he did not then see or hear anything; that he proceeded over the crossing slowly, about the speed that a man would walk; that when the front wheels of his truck had passed the last rail of defendant's second or eastbound track, he was struck by the eastbound train; that when his truck had entered upon the second track the cab of the truck suddenly became illuminated, that he then looked to his right and saw the approaching train 30 feet away. Plaintiff's case as to liability, that is as to the happening of the accident, consisted solely of his own testimony.

The day after the accident the plaintiff was interviewed at his home by a representative of the defendant and signed a statement, witnessed and first read to him by his adult daughter in which he admitted that he did not stop or look because the gates on the Baltimore & Ohio Railroad were in the upright position and he thought it was safe to cross over all the tracks. Plaintiff's daughter, who was present when the statement was given and who read it to her father before he signed it, was not called as a witness to refute its content or to corroborate plaintiff's claim at the trial that he was too sick to properly narrate the happening.

The defendant called the engineer, fireman and trainman of the train. The brakeman was dead and the

conductor ill at the time of the trial. The testimony of the three members of the train crew who testified, which was not shaken on cross-examination, was that the train, which consisted of the locomotive and tender and 35 or 36 freight cars, left McKees Rocks at about 4:30 A.M. en route eastward to Newell about 35 miles away, beyond the scene of the accident; that the headlight of the train was on from the time it left McKees Rocks until its arrival at Newell; that at least four blasts of the whistle were blown at the Center Street crossing which is about 50 car lengths west of the Sheridan Street crossing, that the engine bell was ringing automatically all the way to Sheridan Street and was turned off only after the accident occurred. It is not disputed that the train was traveling about 10 or 12 miles per hour, that the tracks are straight for a considerable distance on either side of the Sheridan Street crossing, that the view from the crossing westwardly, the direction from which the train was approaching, was about 1400 feet with no obstructions, and that the train stopped with the tank or tender of the engine upon the crossing. The engineer testified that he was on the right of the engine and therefore could not see the approaching truck, that he made an emergency stop when he was about 50 feet from the crossing because the fireman who was on the left of the engine told him to "dynamite her". The fireman testified that he "hollered" this to the engineer when he saw that the plaintiff was not stopping but proceeding across the paved area and onto the defendant's tracks.

In entering judgment n.o.v. for the defendant, the lower court held that plaintiff had not established negligence on the part of the defendant and also that plaintiff was guilty of contributory negligence. As to the defendant's negligence, plaintiff contends that the

lower court erred in holding that plaintiff's testimony was negative and overcome by the positive testimony of defendant's witnesses, pointing to decisions of this Court holding that the rule relied upon by the court below does not apply where the negative testimony is that of a witness who for some reason had occasion to attune his faculties to the situation, that here plaintiff's knowledge of the crossing that he was about to traverse furnished a reason for looking and listening for approaching trains, and therefore his testimony that he did not see and did not hear can not be rejected under the negative testimony rule. On the other hand, defendant contends that, assuming there was a reason for plaintiff being attentive, under all the circumstances and plaintiff's own testimony he did not in fact alert his senses to the situation. We find it unnecessary to consider and discuss the issue of negligence thus raised for we are of the opinion that the lower court's action in entering judgment n.o.v. was fully justified on the ground of plaintiff's contributory negligence.

In reaching this conclusion we have reviewed the testimony and treated all facts and reasonable inferences deducible therefrom in the light most favorable to the plaintiff. For this reason we reject from our consideration all evidence relating to the statement made by the plaintiff at his home on the day following the accident. While plaintiff's denial of the truth of its content was far from persuasive, we will treat it as sufficiently denied and consider the plaintiff's account of the happening of the accident as testified to by him at the trial. We first observe that he stated that he was familiar with the crossing, having used it and other nearby crossings of the defendant's railroad in order to reach the mill where he had been employed for six months, that he knew that whichever of these

crossings he used he had to first cross the Baltimore & Ohio Railroad tracks. He also affirmatively stated that he knew that the gates at the Baltimore & Ohio tracks protected only the Baltimore & Ohio crossing and did not protect the Pittsburgh & Lake Erie crossing. After testifying that he drove his truck southward on Sheridan Street and when close to the Baltimore & Ohio tracks stopped and listened, his testimony continues: "Q. There was a gate at the B. & O. track? A. Yes. It was open. And when I stop and listen and look both ways I just pull ahead and that car was just making a turn before me over P. & L. E. tracks. When I come across the street [the paved area between the B. & O. & P. & L. E. tracks] I do the same; I look in both sides and listen. I didn't see nothing coming, no heard noise. I start across. As soon as I was—when I was on the middle of the railroad my cab was all at once on a shining like on fire, on shine. I throw my eyes on the side where light come from and train was right there. I didn't have time to do anything. They just smack me like this (indicating) and push me down on the railroad—oh, I couldn't estimate; maybe about 200 feet. Q. Well, now, Mr. Jursic, was it light or dark at that itme? A. It was dark.". He further testified as follows: "Q. And where was the train when you first saw it; how far away from you? A. When I saw that all shiny was in my cab. Q. Well, when you first saw that how far was the train from you if you saw the train at that time? A. *Oh, that was about 30 feet.* Q. And how long after you saw that did the train strike your truck? A. It was just like this (indicating).".

It will be noted that while plaintiff testified that he stopped, looked and listened *before* starting over the crossing, conspicuous by its absence in plaintiff's account is any testimony that he continued to look or

listen *after* starting across. Indeed his testimony permits only the contrary conclusion that he did not look after starting across until he was committed to the second track and then only when the train was practically upon him and after the headlight of the engine illuminated the cab of his truck. During the time that he proceeded upon and over the crossing he did not testify that the engine's headlight was not on or even negatively that he did not see it. He merely *claimed* that it was not on. His testimony in this connection is as follows: "Q. Now, Mr. Jursic, I think you told us that before you were struck by the train that your whole cab was lighted up; is that right? A. That is right. Q. And your cab was lighted up by the headlight of the train, was it? That is what lit up your cab, was the headlight of the train shining into it. That is what lit it up; is that right? A. Yes. Q. So that the headlight of the train was on wasn't it; it was burning? Do you understand me? A. (No response.) Q. Do you understand me? A. I don't think. Q. Well, I want you to understand. I say that the headlight of the train was shining and the headlight of the train was on as it came down the track and before it hit you? A. Did you mean the train come down and just snapped the light on before? Q. No. I don't mean any such thing. A. Is that what you mean? Q. I certainly do not. A. That is exactly what I claim. Q. Oh, that is what you claim? A. Yes.". Claim is not proof.

The plaintiff was bound to proceed with caution after starting over the crossing. It was his continuing duty both to look and listen. In *Kolich v. Monongahela Railway Co.*, 303 Pa. 463, 154 A. 705, this Court said at p. 467: "It was not sufficient that, before he started, he stopped, looked and listened, as he says he did several times, but he was required to look and

listen, constantly and with the utmost care, until he had safely passed over the track (Tull v. Baltimore & Ohio R. R. Co., 292 Pa. 458; Massinger v. Reading R. R. Co., 300 Pa. 6), the duty of constantly and carefully listening being as imperative as that of constantly and carefully looking: Rhodes v. P. R. R., 298 Pa. 101; Paul v. Phila. & Reading Ry. Co., 231 Pa. 338, 342. Plaintiff says he heard no bell ringing, whistle blowing, nor noise of any kind before he started to use the crossing; but he does not say that he did not see or hear anything after he started, nor that he was giving any attention to either matter before he entered on the track, though this was his imperative duty: Tull v. Baltimore & Ohio R. R. Co., supra. . . .".

Plaintiff contends, however, that whether plaintiff continued to exercise caution when proceeding toward and over the crossing was for the jury, relying on language appearing in the recent case of *Baker v. Pennsylvania Railroad Company,* 369 Pa. 413, 85 A. 2d 416, in a discussion of the case of *Muehlhof v. Reading Co.,* 309 Pa. 17, 162 A. 827. This language at p. 419 of the *Baker* decision is as follows: ". . . The plain intendment of the ruling in the Muehlhof case is that where a traveler stops, looks and listens before entering upon a grade crossing and, neither seeing nor hearing anything approaching on the tracks, proceeds and is thereafter struck by a train on a track beyond the first, the question of his contributory negligence is for the jury. . .", citing, inter alia, *Thomas v. Pennsylvania Railroad Co.,* 275 Pa. 579, 119 A. 717. The quoted language was appropriate to the *Muehlhof* case and to the *Baker* case. In the former there was testimony that the plaintiff was looking after he passed the first track of the crossing for despite a dense fog he saw the approaching train before the collision when it was 300 feet away. This required the question of

his contributory negligence to be submitted to the jury. In the *Baker* case the plaintiff's decedent enjoyed the presumption of the exercise of due care, the train was going 65 miles per hour and there was a confusing background in the direction from which the train was approaching created by the lights of automobiles moving in the same direction as the train on the boulevard adjacent to and paralleling the railroad tracks. Decedent's contributory negligence was therefore held to be for the jury.

The language in question was not intended to mean that in *all* cases where a traveler has been injured beyond the first track of a crossing, his contributory negligence is for the jury. As stated in the *Thomas* case, supra, cited in *Baker* to the quoted text, in such case the traveler's contributory negligence is *"generally* for the jury"* [emphasis supplied]. Where the negligence of the traveler after passing the first track is clearly manifest, especially by his own testimony, he may be declared guilty of negligence as a matter of law. Unquestionably such is the present case. It is difficult under all the testimony to believe that the plaintiff here looked and listened at any time before entering upon the crossing, but we are obliged to accept his testimony that he did. He was not required to *stop* again to look and listen while proceeding over the crossing, but he was under a duty to proceed with care: *Baker v. Pennsylvania Railroad Company,* supra; *Kolich v. Monongahela Railroad Co.,* supra. Whether plaintiff was looking straight ahead or possibly for a place to park in the area beyond and south of the tracks which was his destination, it is clear from his own testimony that he did not continue to look for approaching trains as was his bounden duty. He was proceeding slowly, as was the train, which under his testimony must necessarily have been near at hand.

If he had continued to look as he proceeded toward and over the crossing, he would have seen the train and could have stopped in time to avoid the collision.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On February 8, 1950, at 5:30 a.m., Mike Jursic, a mill worker, left his home on a farm in Stanton, Pennsylvania, to drive to his place of employment, the National Tube works in McKeesport, Pennsylvania. Arriving in McKeesport in his small Dodge truck, he proceeded on Sheridan Street which ran directly up to the mill. To reach his destination, Jursic had to drive over three B. & O. railroad tracks and two P. & L.E. R.R. tracks which crossed Sheridan Street and flanked the mill. Before entering on the B. & O. tracks, Jursic stopped, looked and listened. Seeing and hearing nothing to warn him of any danger he crossed the B. & O. tracks which were separated from the P. & L.E. right of way by a wide pavement. Moving up to the P. & L.E. tracks, Jursic stopped, looked and listened again. The railroad tracks were curtained in darkness and the atmosphere was unbroken by any sound save the rumbling noises from the steel mill. With this assurance of safety, Jursic advanced in slow gear across the P. & L.E. tracks, travelling, because of wariness and irregularities in the surface of the road, at a man's walking pace. While between the two tracks, the cab of his truck was suddenly flooded with the light of an oncoming locomotive and, by the time Jursic's truck's front wheels had passed the last rail, the locomotive was upon him, inflicting physical injuries and damage to his truck, not necessary to consider here.

At the ensuing trial a jury returned a verdict in favor of the plaintiff against the P. & L.E. Railroad

Company. The defendant company moved for judgment n.o.v., which the lower court granted. The plaintiff appealed to this Court, the majority of which sustained the judgment n.o.v., but on entirely different grounds from those announced in the opinion of the court below.

The plaintiff testified that at no time did the locomotive sound a whistle or ring a bell, nor did it flash any admonitory signal light until it was within 30 yards of the crossing when, of course, the plaintiff had no time to avoid the crash. The defendant company called three members of the train crew who collectively testified that the locomotive rang its bell, sounded four blasts of its whistle and travelled with headlight illuminated from McKees Rocks to Newell. The majority opinion say that "the testimony of the three members of the train crew . . . was not shaken on cross-examination." The testimony may not have been shaken on cross-examination, but it was certainly shaken by the jury. In fact, it was demolished by the jury which unequivocally repudiated the testimony of the train crew and definitively accepted the plaintiff's account of the collision.

I do not believe that the jury was very much impressed with the testimony of one of these three witnesses, the fireman, who said that although he saw the plaintiff on the track he did not warn the engineer who, on the other side of the cab, could not see what was ahead of him. After admitting he knew of the plaintiff's presence on the tracks, the witness went on to testify: "I didn't say anything to the engineer because I didn't think it was necessary at the time and when he approached the paved street between the two tracks I still kept my eye on him because we got to be about a car length away from the Sheridan Street crossing—I knew definitely where he was going then

and I hollered to the engineer to 'dynamite' it, and then I shut the valve on the stoker off and I followed the brakeman down to the front to see how bad the man was hurt."

This statement alone, revealing as it does, wanton negligence on the part of the defendant's employe, would entitle the plaintiff to a recovery.

The majority states that it is unnecessary to consider or discuss the issue of negligence because judgment n. o. v. is fully justified on the basis of contributory negligence. If we intend to give anything more than lip service to the rule that in a review of this kind, all contradictions and doubts in the evidence are to be resolved in favor of the verdict-winner, I fail to see how this Court can in law and logic brand this plaintiff guilty of contributory negligence. Mike Jursic was on his way to work. Crossing the railroad track was a matter of earning his daily bread. He did everything that was humanly possible for one to do to avoid being struck by a train. As I had occasion to say in the case of *Meade v. Pennsylvania Railroad Co.*, 375 Pa. 325, the right of a railroad company to sever a public thoroughfare in two with a piercing locomotive is a right exercised in the best interests of society, but the right of travellers to be saved from unnecessary harm is equally sacred in the law.

If the headlight on the locomotive had been shining, its beam would have flashed warning to Mike Jursic. The majority assumes that the headlight was operating, although the jury has found that it was not. In support of this assumption the majority states that the plaintiff did not prove that the headlamp was not lit, but that he merely *claimed* this. I quote the plaintiff's testimony which, with all the unvarnished phrases of an unlettered mill worker, still graphically portrays what happened: "When I come across the street

I do the same; I look in both sides and listen. I didn't see nothing coming, no heard noise. I start across. As soon as I was—when I was on the middle of the railroad my cab was all at once on a shining like on fire, on shine. I throw my eyes on the side where light come from and train was right there. I didn't have time to do anything. They just smack me like this (indicating) and push me down on the railroad—oh, I couldn't estimate; maybe about 200 feet."

The majority quotes from the plaintiff's cross examination as follows: "Q. So that the headlight of the train was on, wasn't it; it was burning? Do you understand me? A. (No response.) Q. Do you understand me? A. I don't think. Q. Well, I want you to understand. I say that the headlight of the train was shining and the headlight of the train was on as it came down the track and before it hit you? A. Did you mean the train come down and just snapped the light on before? Q. No. I don't mean any such thing. A. Is that what you mean? Q. I certainly do not. A. That is exactly what I claim. Q. Oh, that is what you claim? A. Yes."? With this quotation the majority disposes of the plaintiff's case with the laconic utterance: "Claim is not proof."

The plaintiff was obviously not a person schooled in the niceties of the English language. For instance, when he was asked: "Would you have heard a whistle or a bell if any had been sounded?" he replied: "I don't got you" When asked in cross-examination if he had had a view down the straight track, he answered: "What kind of straight you tell me now?" Describing the episode of the taking of the statement by the representative of the railroad company at his home, he testified: "Mostly I remember that they was twisting me and asking me, I don't know how many times, same question and mine daughter was standing

with me by bed when I was lay down. I wasn't sit down. And while I was hollered from the pain, so I was bad hurt, and dope with—I don't know what— from the shock maybe I got before, and Dr. Hiberger give me from his medicine. . ."

To hold a person of such obvious lingual limitations to the technicalities of grammar and rules of syntax does not comport with the principles of justice which aim at ascertaining the truth even if it must be dug from beneath a mountain of solecisms, dredged from a marsh of malapropisms and hunted in a jungle of grammatical blunders.

It so happens, however, that, without the benefit of a college education, Mike Jursic used a proper popular expression. He claimed the headlight was not operating. What is the definition of "claim"? One of its meanings (Webster's Unabridged Dictionary) is "to assert as a fact, right or relation which ought to be acknowledged or conceded." Jursic asserted that the headlight was unlit. If one asserts that the sun rises every morning and another contradicts that assertion, the former *claims* that his statement is true. To say, after a verdict, that claim is not proof is to say that contradicted assertions from the witness stand, no matter how verified by other witnesses and no matter how accepted by the jury as true, still do not constitute proof.

But this discussion, as well as the assertion of the majority in this respect, is entirely supererogatory because the plaintiff specifically testified that the locomotive approached in darkness and that the headlight was thrown on just before the accident: "Q. Well, how do you account for the fact that you couldn't see this train coming toward you with its headlights on; how do you account for that?   A.   The way I figure,

*lights was just snapped on me before it struck me.* This is the way I figure." (Emphasis supplied.) And it may be added that this answer of the plaintiff's in cross-examination *followed* the "claim" answer, so that if his previous response was the result of misunderstanding, it was certainly cleared up by the unequivocal statement that the lights were "just snapped on" before the collision.

The majority decision falls into another error, as I view it, when it attributes contributory negligence to the plaintiff because of the manner in which he crossed the tracks. I quote from the majority opinion: "It will be noted that while plaintiff testified that he stopped, looked and listened *before* starting over the crossing, conspicuous by its absence in plaintiff's account is any testimony that he continued to look or listen *after* starting across. Indeed his testimony permits only the contrary conclusion that he did not look after starting across until he was committed to the second track and then only when the train was practically upon him and after the headlight of the engine illuminated the cab of his truck." This assertion would assume that the crossing over the P. & L. E. tracks was a *long* and tortuous trip and that throughout this *lengthy* journey the plaintiff ignored everything on his right or left. The distance between the point where he stopped to look and listen and the point where he was struck could be only *some 20 feet,* not more than 2 lengths of his truck. Considering the fact that the track here was a straightaway for a half mile, if the locomotive lights had been functioning, the plaintiff would have seen the glare from the point where he very definitely stated he had looked and listened. One glance would tell the story.

But here again the majority opinion pours water into a sieve, because the plaintiff *did* testify that he

*did* look while crossing the tracks. The defendant company's attorney was cross-examining the plaintiff on whether the windows of his truck were open as he crossed the tracks: "Q. The one on the right was up? You mean the one on the right was closed, is that what you mean? A. On the right was up. Q. Well, you mean up and closed? A. On my side, that window is always down because I hardly wait to get out so I use much tobacco. I always spit, see? That window was down. Q. Were you chewing tobacco as you crossed this crossing? A. Huh? Q. Were you chewing tobacco as you crossed this crossing? A. Well, I chew tobacco all the time. Q. And spitting out the window, huh? Well, maybe . . . you were so busy spitting out the window you didn't look up to the right? *A. I did.* Q. Well, did you? *A. Yes, sir.* Q. You say you did look? A. *I did look, yes."*

Mike Jursic was injured by a collision with a locomotive, but it would appear that his inability to hold the verdict won before a jury was due to a second collision—this time with the English language.

I dissent.