Riesberg, Appellant, *v.* Pittsburgh & Lake Erie Railroad.

Argued March 21, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

436

*Chauncey Pruger,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*David M. Kaufman,* with him *Sachs, Pervin, Kaufman & Menzer,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 3, 1962:

The background of these appeals, involving questions of both contributory negligence and negligence, is an accident wherein a train collided with an automobile at a railroad crossing.

On July 23, 1955, and for some years prior thereto, the Pittsburgh & Lake Erie Railroad Company (Rail-

road) owned and maintained a railroad crossing, known as the River Road Crossing, in the Borough of McKees Rocks, Allegheny County. At grade, three separate sets of railroad tracks cross a public highway known as River Road; the tracks run generally east-west and the highway north-south. The northernmost track is separated by some distance* from the two southernmost sets of tracks. At the southerly end of the crossing lies Carson Street, a public highway, which runs east-west and parallels the railroad tracks. At both ends of the crossing are railroad gates (each of which gates extends across approximately one half of River Road), blinker lights which operate with the gates and traffic lights which not only control the movement of traffic on River Road and Carson Street but also operate automatically with the gates. Situated, between the most northerly set of tracks and the two other sets of tracks, on the easterly side of River Road is a shanty for the watchman employed by the Railroad to guard the crossing. Approaching the railroad crossing from the north there is a view to the west of at least fifteen hundred to two thousand feet and to the east of the crossing are two railroad bridges. ,

At approximately eleven o'clock on the morning of July 23, 1955—a clear day with visibility good—Mrs. Florence Riesberg, accompanied by her then one and one half year old son, was driving an automobile over the River Road crossing when it was struck in the rear by an eastbound locomotive of a seven car passenger train and both Mrs. Riesberg and her son, David, sustained personal injuries and the automobile was totally wrecked.

---

* A sketch attached to Riesbergs' brief confirms the statement at oral argument that this distance was 52 feet. The area between the northernmost set of tracks and the two southernmost sets of tracks is macadam covered. For practical purposes it might be considered as two separate crossings.

W. C. Riesberg, as father and natural guardian of David Riesberg, and W. C. Riesberg and Florence Riesberg, his wife, instituted a trespass action in the Court of Common Pleas of Allegheny County against the Railroad. At trial before Judge F. G. WEIR and a jury, at the conclusion of Reisberg's case, the trial judge entered a compulsory nonsuit against both Mr. and Mrs. Riesberg on their claims arising from the injuries sustained by Mrs. Riesberg. However, the trial judge permitted the jury to pass upon three claims arising from the accident: (a) the claim of the minor, David Riesberg, (b) the claim of W. C. Riesberg for expenses, etc., arising from the injury to David Riesberg and (c) the claim of W. C. Riesberg for the damage to the automobile. The jury returned verdicts in favor of the Railroad and against the Riesbergs on all three claims.

Motions were made for a new trial and the court, after hearing argument, ruled: (1) that Florence Riesberg was guilty of contributory negligence as a matter of law and such contributory negligence precluded not only recovery by her of any damages but also precluded the husband from the recovery of any damages arising from the injuries which she had sustained and, therefore, the entry of compulsory nonsuits as to both was proper: (2) that as the automobile was owned and titled in the name of a corporation and not W. C. Riesberg, the court erred in permitting the jury to pass upon W. C. Riesberg's claim for the damages to the automobile and, therefore, instead of submitting that claim to the jury, the trial court should have entered a compulsory nonsuit; (3) that W. C. Riesberg's claim for reimbursement for money expended by him for the care of his injured child should not have been submitted to the jury since one parent cannot recover damages consequent to the injuries of a child who is in the custody of the other parent who, by her own negligence, has contributed to the happening of the accident; (4)

that the court's instructions to the jury that "the case for the child and the case for the father stand on the same footing in regard to liability" and that it would be inconsistent to find a verdict for the child and not for the father were erroneous under the circumstances and, therefore, a new trial must be granted as to the claim of the child for damages.

From these rulings of the court below three appeals have been taken to this Court. From the order granting a new trial to the child the Railroad appeals (Appeal No. 139). From the judgments of nonsuit against Florence Riesberg and W. C. Riesberg and from the judgment entered on the verdict against W. C. Riesberg appeals have been taken (Appeals Nos. 143, 144).

### Appeals from Entry of Judgments of Nonsuit

In passing upon these appeals we bear in mind the well settled rule that we view the testimony and all reasonable inferences arising therefrom in the light most favorable to Riesbergs.

The crux of these appeals is whether under the evidence Florence Riesberg was guilty of contributory negligence as a matter of law. If she was, the judgments of nonsuits were proper; if she was not, then both judgments must be set aside.

When Mrs. Riesberg approached the northerly entrance to River Road crossing the street traffic and crossing light was red and she stopped the automobile. Both directly ahead and in the rear other automobiles stopped and, when the light changed to green, the driver of the car ahead was slow to proceed and cars in the rear honked their horns. The forward car then proceeded to traverse the crossing and, when that car was about two-thirds across, Mrs. Riesberg started over the crossing. At that time the crossing gates at both the northerly and southerly entrances were in a raised

position. Mrs. Riesberg crossed over the first set of tracks, then over the area between that set of tracks and the second set of tracks, then over the second set of tracks and was engaged in crossing over the third set of tracks when she heard the watchman yelling, saw the Carson Street gate descending and heard the bells and whistle of an oncoming locomotive. She then *for the first time* looked to her right or to the west, the direction from which the locomotive approached, and saw the train approximately one hundred feet away. Mrs. Riesberg's automobile was then stopped somewhere in the left lane of the crossing, with the front wheels of the automobile beyond the third set of tracks and the rear wheels still on the tracks. At that time Mrs. Riesberg either fainted or "blacked out". The following testimony of Mrs. Riesberg is significant: "Q. Now, Mrs. Riesberg, when you were proceeding across the crossing . . ., as you were coming up River Road and the car in front of you had the green light and you started, and at any time while you were going across the crossing, across the first track, across the intervening space, at any time did you look to your right to see if there were trains coming? A. No. Q. You did not? A. No."

Assuming, that Mrs. Riesberg at the northerly entrance to the crossing—before she committed herself to the crossing—stopped, looked and listened and that she was invited, by implication, to proceed by the green signal of the crossing light and the raised gate, there is no testimony that from that point forward Mrs. Reisberg ever looked in either direction, right or left, or listened as she proceeded across the crossing; on the contrary, there is a direct denial by Mrs. Riesberg that she continued to look and listen as she traversed the crossing. Under such circumstances, her contributory negligence is clear, particularly when one considers the length of this crossing.

One who crosses a railroad at grade is under a duty not only to stop, to look and to listen before entering upon the crossing but also *to continue* to look and to listen while traversing the crossing: *Kolich v. Monongahela Railway Co.,* 303 Pa. 463, 154 A. 705; *Matesky v. Lehigh Valley R.R. Co.,* 312 Pa. 233, 167 A. 306; *Schwenk v. Pennsylvania Railroad,* 315 Pa. 434, 174 A. 1; *Petruskewicz v. Reading Company,* 318 Pa. 585, 179 A. 428; *Kunicki v. Lehigh Valley R.R. Co.,* 321 Pa. 590, 185 A. 193; *Burkman v. Anderson,* 324 Pa. 206, 188 A. 287; *Witkowski v. Lehigh Valley R.R. Co.,* 338 Pa. 510, 12 A. 2d 908; *Valera v. Reading Company,* 349 Pa. 123, 36 A. 2d 644; *Jursic v. Pittsburgh & Lake Erie Railroad Co.,* 376 Pa. 142, 102 A. 2d 150.

In reliance on *Richardson v. Pennsylvania Railroad,* 338 Pa. 155, 12 A. 2d 583, *Sharpless v. D. L. & W. Railroad,* 286 Pa. 439, 133 A. 636 and *Johnson v. Director General of Railroads,* 278 Pa. 491, 123 A. 484, Riesbergs contend that the rule that one must continue to look and to listen while traversing a railroad crossing does not apply in a situation where, by a green signal of a crossing light or raised crossing gates, a railroad impliedly invites one to proceed across the tracks. *Richardson, Sharpless* and *Johnson,* supra, do not so hold. These decisions do recognize that such actions on the part of the railroad, as a green signal of the crossing light, raised crossing gates and the actions of a watchman, constitute an implied invitation to cross the tracks and that such actions are factors to be taken into consideration in determining whether there has been contributory negligence on the part of the person traversing the tracks. However, these decisions do not relieve the person crossing the railroad tracks of the duty to continue to look and to listen nor do they hold that, where there is a green crossing light, raised gates, etc., the question of contributory negligence is always for the jury. On the contrary, there are a host of de-

cisions which hold that, despite the implication of an invitation to traverse the tracks from the actions of the gate, the crossing light or the watchman, it is still the duty of the person traversing the crossing to continue to look and to listen: *Greenwood v. Phila., Wilmington & Baltimore Railroad Co.*, 124 Pa. 572, 17 A. 188; *Ihrig v. Erie Railroad Co.*, 210 Pa. 98, 59 A. 686; *Earle v. Phila. & Reading Railway Company*, 248 Pa. 193, 93 A. 1001.[1]

It is clear beyond question that Mrs. Riesberg was guilty of contributory negligence as a matter of law under the instant circumstances. Even though the crossing gates were raised and the crossing light green in her favor, Mrs. Reisberg did not proceed to traverse the crossing until some time had elapsed and then she proceeded to traverse, at three miles an hour, approximately ninety feet of the crossing without looking either to her left or right to ascertain train movements in either direction. Had Mrs. Riesberg during that time looked to her right she had a view of at least fifteen hundred to two thousand feet in the direction from which the train was approaching and she must have seen this train. Instead of that, she proceeded to traverse the crossing and did not look in either direction until by the signals and bells of the train, the yelling of the watchman and the lowering of the Carson Street crossing gate, she was alerted to look to the right. It was then too late and the accident was inevitable.

Riesbergs contend that when the Carson Street gate was lowered, Mrs. Riesberg was trapped and that she

---

[1] See also: *O'Neill v. Reading Company*, 296 Pa. 319, 145 A. 840; *Miller v. Pennsylvania Railroad*, 299 Pa. 63, 149 A. 85. Cf: the duty of motorists approaching or traversing street intersections with a green traffic signal in their favor: *Ratcliff v. Myers*, 382 Pa. 196, 113 A. 2d 558; *Lewis v. Quinn*, 376 Pa. 109, 101 A. 2d 382.

is thereby, in some manner, relieved of any negligence on her part. The record indicates that this gate was a half-gate which extended only halfway across the River Road crossing and blocked only such traffic as would be proceeding to cross the tracks in a northerly direction. Had Mrs. Riesberg been in the right and proper lane on the River Road crossing instead of in the left lane the gate would have offered no impediment to the movement of the automobile. As we view this circumstance it augments, rather than relieves, Mrs. Riesberg's negligent conduct.

Under the circumstances the entry of a compulsory nonsuit against Mrs. Reisberg was proper and such judgment must stand.

Mr. Reisberg claimed the recovery of damages for (1) past and future expenses arising from the injuries suffered by his wife and (2) loss of "the comfort, society and services", i.e., consortium of his wife. Such claim for damages is a derivative claim and the contributory negligence of the wife bars the husband from the recovery of damages consequential to the injuries sustained by the wife: *Winner v. Oakland Township,* 158 Pa. 405, 27 A. 1111; *Schmidt v. Pittsburgh Railways,* 127 Pa. Superior Ct. 161, 193 A. 67; *MacLeay v. Beckwith Machinery Co.,* 131 Pa. Superior Ct. 338, 200 A. 124. In *MacLeay,* supra, the Superior Court, speaking through the late President Judge KELLER, said (p. 340) : "If the wife was not entitled to recover damages from the defendant for her injuries—whether because the defendant was not negligent or because she herself was guilty of contributory negligence—it followed that the defendant would not be liable to the husband for his expenses, etc. growing out of that injury."

In view of Mrs. Riesberg's contributory negligence the court below very properly directed the entry of a compulsory nonsuit against Mr. Riesberg and that judgment must stand.

In the complaint filed in this action there is no averment as to the ownership of the automobile which was being operated by Mrs. Riesberg at the time of the accident although at trial Mr. Riesberg did claim damages for the replacement value of the automobile and the loss of its use for a long period of time. The automobile was not owned by Mr. Riesberg but it was owned by and titled in the name of Carson Steel Company, a corporation of which Mr. Riesberg was president and the sole stockholder. At trial the court permitted the claim for the automobile damage to be submitted to the jury; later in its opinion refusing a new trial to Mr. Riesberg the court ruled that it had erred in permitting the submission of this claim to the jury and with this ruling we agree. The present circumstances do not justify a disregard of the corporate entity so as to justify a suit for the recovery of this item of damage by the corporation's sole stockholder.

### Appeal from Entry of Judgment on Verdict Against Mr. Riesberg On Claim For Damages Arising From Injury to Son

The contributory negligence of Mrs. Riesberg bars an action by Mr. Riesberg for expenses, etc., arising from the injuries incurred in this accident by the Riesbergs' son. The mother's negligence which contributed to the happening of this accident which caused the injuries to the son precludes a recovery by the father for any losses which the latter may have suffered as the result of the injuries to the child: *Connelly v. Kaufmann & Baer Co.,* 349 Pa. 261, 267, 268, 37 A. 2d 125; *Parks v. Parks,* 390 Pa. 287, 303, 135 A. 2d 65. Therefore, the judgment entered on the verdict in connection with this claim must be sustained.

## Appeal From Order Granting a New Trial
## To The Child

The court below granted a new trial on the ground that its instructions to the jury which equated the right of the child to recover with the father's right of recovery were erroneous. The Railroad appeals from this grant of a new trial on two grounds: (a) that there is no evidence of record which would justify a finding of any negligent conduct on the part of the Railroad and (b) even if the court's instructions were erroneous as to the rights of the child, the verdict of the jury was not premised on any such erroneous instructions but rather on the lack of any evidence of negligent conduct on the part of the Railroad.

In *Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, 153 A. 2d 477, this Court, speaking through Mr. Justice McBRIDE, stated: "We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. [citing cases]. Clearly this does not mean that the jury may not draw inferences based upon all the evidence and the jurors' own knowledge and experiences, for that is, of course, the very heart of the jury's function. It means only that the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the *only* one which logically can be reached. It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. . . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion

can be arrived at which would place liability on the defendant."

In the light of *Smith,* supra, and its criterion for evaluating the adequacy of the evidence to warrant submission to a jury of the question of a defendant's liability we have reviewed the instant record. While not strong, there is evidence upon which a jury could reasonably conclude that the Railroad was negligent. Under such circumstances, we cannot say that the court below erred in granting a new trial to the child.

Lastly, the Railroad urges that, even though the court's instructions were erroneous, it was the lack of evidence of the Railroad's negligence rather than the court's erroneous instructions which resulted in a verdict for the Railroad. We cannot probe the minds of the jury to pinpoint the reason for its verdict. We do know that the claim of the child for damages was submitted to the jury under instructions which were fundamentally erroneous. Whether such instructions *did* or *did not* bring about this verdict is not the question; that such instructions *might have* done so requires the grant of a new trial.

The appeal from the order granting a new trial cannot be sustained.

Judgments of nonsuit against Florence Riesberg and W. C. Riesberg (Appeal No. 143) are affirmed. Judgment entered on verdict against W. C. Riesberg and in favor of the Railroad (Appeal No. 144) is affirmed. Order granting new trial to David Riesberg (Appeal No. 139) is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I respectfully submit that the decision of the Majority in this case offends against the law of Pennsylvania, against the law of humanity, and against the law of natural justice. A railroad company which builds its tracks across a public thoroughfare has the

legal duty to protect the public from the possibilities of death or serious injury which its high-speed, heavy trains can inflict upon people properly using that public thoroughfare. Until the moment that the trains are actually physically on the road, that road remains the territory of the municipality in which it is located. Thus, the right of the public to use that public road, across which a railroad has thrown its tracks, is not inferior to the right of the railroad to run its trains.

The legal principles which require a traveler to stop, look and listen before entering upon a railroad crossing apply equally well to the railroad company itself. It has the duty to look and listen—and stop any train that is about to kill or maim any person legitimately on the public crossing.

The law of Pennsylvania very clearly indicates that a railroad company has the responsibility of informing the public, adequately warning the public, and taking every feasible precaution to protect that public from a train it is about to charge across a public road.

The railroad company in the case here on appeal did not measure up to that responsibility, so far as this particular case is concerned. It stood at the crossing, invited Mrs. Florence Riesberg with her one-and-a-half year old child to come onto the crossing, told her that it was all right to pass over the crossing, and then, when she was over halfway across the crossing, allowed a passenger train with its thundering, massive locomotive followed by tons of massive steel to strike down mother and child and inflict upon them injuries from which they will never totally recover as long as they live. And then, instead of requiring the railroad to pay for the damage it wrought to bone, muscle and flesh, this Court tells Mrs. Riesberg that the disaster which overcame her was all her fault.

Here are the indisputable and *undisputed* facts, since the Railroad did not call any witnesses at the

448

trial. On the morning of July 23, 1955, Mrs. Florence Riesberg with her infant boy strapped into a hanging canvas seat at her side, drove her car southwardly on River Road in McKees Rocks to a railroad crossing known as the River Road Crossing. At this point the Borough of McKees Rocks maintains a traffic light and the Railroad also maintains signal lights. Both the borough light and the railroad lights registered red. At this point Mrs. Riesberg was in a line of three cars. When the lights changed to green, the first car started across the crossing and Mrs. Riesberg followed. The crossing is equipped on either side with the usual "gates," they being mobile poles attached at one end to hinges so that when the track is clear of approaching or passing trains the poles are perpendicular, but when trains are about to pass, and while they are passing, the poles are lowered into a horizontal position, thus notifying the public to stay clear of the railroad tracks.

When the lights changed from red to green and Mrs. Riesberg started across the crossing these poles were upright. They remained in that posture as she moved across the crossing. There was at this time not the slightest indication that a train was approaching the crossing. A watchman employed by the railroad to inform the public by word, gesture and movement when its trains are approaching stood by, inviting Mrs. Riesberg by his silence to continue to proceed forward across the crossing.

Three railroad tracks cross River Road, one at the northern terminus of the crossing, and two at the southern terminus. When River Road reaches the southern side of the crossing it runs into Carson Street. It was Mrs. Riesberg's intention when she passed over the crossing to turn to the left on Carson Street and proceed on her way eastwardly to Pittsburgh.

Mrs. Riesberg had traversed over one-half of the distance across the crossing, when flashing lights and

bells announced the coming of a train and the crossing watchman came yelling toward her. She was now on the last track at the southern extremity of the crossing and had started to make the turn to the left which would put her on Carson Street for the trip to Pittsburgh. The train was about one hundred feet away bearing down on her from the right rear. While all this was happening the gate slammed down in front of her shutting off her escape to Carson Street. In terror and agony she tried to save her baby. She tugged at the belt which fastened the child in the canvas chair. The catastrophe which she saw about to engulf her proved too much for her nerves and she "blacked out." The train, never slackening its speed, struck the rear of the automobile and threw it around in such a manner that it then hit the train. The violence of the impact was such that Mrs. Riesberg was thrown out of the car, falling to the street bleeding from injury; the screaming baby was hurled fifteen feet to the street. The car was demolished.

Mrs. Riesberg, by herself and through her husband, brought actions in trespass against the railroad company.* At the trial, the trial judge entered a nonsuit against Mrs. Riesberg, asserting that she was guilty of contributory negligence. This Court has sustained that nonsuit, and, it is to this grievous error, which I believe this Court is committing in affirming that nonsuit, that I address this dissenting opinion.

There can be no doubt whatsoever that the circumstances of the accident were such that a jury could find the railroad company negligent. In fact, the Majority has ordered a new trial in behalf of the child because "there is evidence upon which a jury could reasonably conclude that the Railroad was negligent." But

---

* There were three suits in all, completely described in the Majority Opinion, so that there is no need on my part to describe them again.

the Majority holds that Mrs. Riesberg is not entitled to recover for her injuries and Mr. Riesberg is not entitled to reimbursement for expenses to which he has been subjected and will continue to be subjected to, in caring for the hurts and disablements of his wife and child. There can be no recovery for these losses, the Majority says, because of one word uttered by Mrs. Riesberg during the trial, the word being "No."

In the cross-examination of Mrs. Riesberg, the defendant's counsel asked her: "Now, Mrs. Riesberg, when you were proceeding across the crossing, that is, using this jury rail here again as the crossing, as you were coming up River Road and the car in front of you had the green light and you started, and at any time while you were going across the crossing, across the first track, across the intervening space, at any time did you look to your right to see if there were trains coming?" Mrs. Riesberg's answer was "No."

The lower court held, and this Court has affirmed, that that *No* spelled doom to her cause of action. I don't think so. Nor does the law as spoken by this Court in the past justify so Draconian a judgment. Nor does a fair-minded concept of justice accept such a conclusion.

There is something inherently unacceptable to a sense of true justice about a court excusing a railroad company which invites a mother with her child in an automobile to come onto a crossing, assures her that she is safe, makes that assurance almost positive by displaying green lights, displaying gates in a vertical, "go-ahead" position, displaying a watchman who observes her crossing and in no way suggests there could be danger, fails to ring bells and flash warning lights until she has proceeded so far into the crossing that she cannot withdraw, and then allows a passenger train, which does not decrease its tremendous velocity, to smash into the car, inflicting horrible injuries, and

then refuses to allow her any compensation, simply because when she was asked if she looked to the right she said No, when every device of the railroad, every employee of the railroad involved in the accident told her and kept telling her: Go ahead!

The Majority Opinion says that if Mrs. Riesberg, while passing over the crossing had looked to the right, she would have "had a view of at least fifteen hundred to two thousand feet in the direction from which the train was approaching." What the Majority is suggesting is impossible in the circumstances without immeasurably magnifying the danger to the motorist. In the first place the distance of view of 1500 to 2000 feet to which the Majority refers is only possible to one who stands in the middle of the crossing, faces directly toward the west and unimpededly unleashes his vision to its fullest extent. But it is elementary that a person driving a car in a southwardly direction cannot look wholly to the west without swivelling his head 90 degrees, and, if he does that, he can no longer see where he is going and what is happening in front of the car. If, while in the process of devouring the panorama on the right, the motorist runs into something ahead, he indeed will be guilty of contributory negligence. The person who is driving *prudently,* if he casts a glance to his right, can only get a short angular view, not the impossible 1500-2000 feet that the Majority mentions.

Moreover, there is not the slightest bit of evidence in the case that even if Mrs. Riesberg had looked to the right, considering her limited angular view, she could have seen the train in time to avoid the collision because it is not controverted that the train did not reduce its speed until after it had struck the car.

And then, since Mrs. Riesberg's destination was Pittsburgh, which was to her left, she had to be concerned about turning to the left. River Road, after traversing the crossing, hits a dead end, running di-

rectly, as already stated, into Carson Street. Mrs. Riesberg had to be concerned about automobiles coming from the left on Carson Street, the street into which she would turn from the crossing. Mrs. Riesberg also had to be concerned about trains coming from Pittsburgh, which would also be coming from her left. The Majority Opinion says that Mrs. Riesberg "did not look in *either* direction" (emphasis supplied) until "she was alerted to look to the right." There is no testimony in the entire record that she did not look to the left. The whole burden of the cross-examination was as to whether the plaintiff had *looked to her right.*

The Majority Opinion states the usual rule, namely, "In passing upon these appeals we bear in mind the well settled rule that we view the testimony and all reasonable inferences arising therefrom in the light most favorable to Riesbergs."

I will now show that in applying that rule the Majority must have worked in a very dim light, so far as the testimony and inferences "favorable to Riesbergs" is concerned. The Majority Opinion argues: "Riesbergs contend that when the Carson Street gate was lowered, Mrs. Riesberg was trapped and that she is thereby, in some manner, relieved of any negligence on her part. The record indicates that this gate was a *half-gate* which extended only halfway across the River Road crossing and blocked only such traffic as would be proceeding to cross the tracks in a northerly direction. *Had Mrs. Riesberg been in the right and proper lane on the River Road crossing instead of in the left lane the gate would have offered no impediment to the movement of the automobile.* As we view this circumstance it augments, rather than relieves, Mrs. Riesberg's negligent conduct." (Emphasis supplied)

The "half-gate" which the Majority refers to was not a half-gate, nor was Mrs. Riesberg in the left lane. Mrs. Riesberg testified: "That gate *comes further than*

*just where the center line would be."* "Well, it looked like my car was completely covered by the gate. It looked big." A witness, Barton M. Bromley, testified: "I notice that the gate on the River side is much smaller than the gate on the McKees Rocks side [that is, the Carson Street side], and I would say that it overlaps the center . . . *I am sure that it goes across the center of the road."* (Emphasis supplied)

Michael Popko, who was in the car following Mrs. Riesberg, and who saw the accident happening was cross-examined as to whether Mrs. Riesberg was where the Majority says in its Opinion she was. Here is the testimony which the Majority says it reads in "the light most favorable to Riesbergs": "Q. Now, as you observed Mrs. Riesberg's car ahead of you, was it in the right lane? A. When it was crossing the railroad? Q. As it was crossing the track? A. *I'd say she was in the right lane. She was in her right traffic lane when she started across the track, yes, sir."* (Emphasis supplied)

The whole theory of nonsuit in this case is based upon a proposition which has no bearing on the cause of the accident. In order properly to nonsuit on the basis of contributory negligence the evidence must show that the alleged contributory negligence contributed to the happening of the accident. The asserted contributory negligence here is that Mrs. Riesberg failed to look to the right as she crossed the tracks, but the evidence is clear that her failure to look to the right had nothing to do with the collision. It is interesting history in a narrative of the episode but it in no way figures as a factor in causing the collision between the train and the automobile.

It is self-evident that a warning to be given travelers at a railroad crossing must take place before the train actually makes its appearance. There certainly would be no point in telling motorists at a crossing,

of the arrival of a train after the train was furiously speeding through the crossing. The warning equipment at a railroad crossing must be so synchronized as to keep travelers off the crossing *before* the train arrives at the crossing. In this case the evidence is crystalline clear that the warning bells did not ring, the lights did not begin to flash until *after* Mrs. Riesberg was on the crossing and was on her way across to the other side. Popko testified that Mrs. Riesberg had passed the watchman's station in the crossing "when there was a lot of bells, station bells, that a train was approaching, *but the light was green.*" (Emphasis supplied). If Mrs. Riesberg had failed to look before she started across the crossing, the subject of contributory negligence would be in the case, but if she had looked when the train was practically on top of her, her looking could not have averted the accident.

In the case of *Ulmer v. Hamilton,* 383 Pa. 398, the plaintiff was struck by the defendant while crossing a street and recovered a verdict. The defendant urged judgment n.o.v. because the plaintiff failed to look to his right before crossing the street. In view of the fact that the collision occurred after the plaintiff had reached the half-way mark, across the street, we held that in the circumstances of the case it didn't matter whether he looked or not because he was hit when the motorist changed his course and came over to his wrong side of the street. "When Mr. Ulmer [the plaintiff] started across the street the defendant's car was in no more threatening position than it was when Mr. Ulmer reached the center of the street. When the plaintiff arrived at the center of the highway, the defendant's car was in a posture of innocuous irrelevancy . . . Without warning and without reason the defendant's car then headed for the center of the highway . . . It was for the jury, and not for the Court, to determine . . . whether the plaintiff in any negligent manner contributed to the happening of the accident."

In the case at bar, it was for the jury to determine whether Mrs. Riesberg's failure to look to the right "in any negligent manner contributed to the happening of the accident." When Mrs. Riesberg started across the crossing, there was no reason to fear a railroad train because none was in sight, nor did those charged with giving warning offer any warning that a train might even be approaching the crossing. In these circumstances the most unfavorable conclusion which could be logically reached against the plaintiff would be that it was for the jury to determine whether her failure to look to the right "in any negligent manner contributed to the happening of the accident."

In *Goldschmidt v. Schumann*, 304 Pa. 172, the wife-plaintiff was struck by an automobile as she crossed the street without looking. She said that she depended upon her husband's looking, since he was with her. We held that it didn't matter whether she looked or not because "if she had looked before stepping into the cartway, she would have seen only what her husband saw, defendant's car 245 feet away on the other side of the street. In the situation as it would then have appeared to her she would not have been lacking in due care in proceeding just as both she and her husband actually did proceed; hence the failure to look could not be said to be the contributing cause of the accident, and indeed it was not the cause of it at all . . . It was not her failure to look that caused the accident, nor would her looking have prevented it; the cause was the defendant's unlawful operation of his car."

Applying that unimpeachable rationalization to the accident in this case, the inevitable conclusion follows that it was not the failure of Mrs. Riesberg to look which caused the collision, "the cause was the defendant's [railroad company's] unlawful operation of" its railroad at this point.

The nonsuit in this case is built upon straws of irrelevancy which, touched by the slightest force of logic

and legal principles, must collapse as a house of sand can tumble from the hand of a child. I have already indicated one irrelevancy or two. There are others. The Majority Opinion makes a point of the assertion (not admitted by Mrs. Riesberg) that she did not start across as soon as the lights turned from red to green. As already stated, Mrs. Riesberg was a second car in a line of three waiting at the northern end of the crossing. The Majority Opinion says: "The forward car then proceeded to traverse the crossing and, when that car was about two-thirds across, Mrs. Riesberg started over the crossing . . . It is clear beyond question that Mrs. Riesberg was guilty of contributory negligence as a matter of law under the instant circumstances. Even though the crossing gates were raised and the crossing light green in her favor, Mrs. Riesberg did not proceed to traverse the crossing until some time had elapsed and then she proceeded to traverse . . ." I cannot help but wonder what the Majority means by "some time." The phrase is so unprecise that it could mean ten seconds, ten minutes, or ten hours. But Mrs. Riesberg did not say that she waited at all. She testified: "The light turned green, and the car ahead of me started to move on. *I followed it.*" (Emphasis supplied).

But, assuming she did not start at the instant the lights turned green, what has that to do with the accident? Neither did the car ahead of her start forward instantaneously. Motorists at railroad crossings are well advised not to plunge ahead over railroad tracks like race horses digging their hooves into the turf at the crack of the pistol shot. There is always bound to be some danger involved in crossing railroad tracks and a pause of extra caution is not out of order.

However, despite all that, this pause which the Majority emphasizes, and perhaps exaggerates, had nothing whatsoever to do with the cause of the collision.

There is no rule that one must proceed across railroad tracks at any certain speed. One does not race across the tracks with the idea of beating the train to the rendezvous with disaster. One proceeds across the tracks measuredly in order best to maintain possession of one's faculties.

But, to come back to the Majority's argument that Mrs. Riesberg delayed crossing. If she had been the fifth or sixth in the line of cars, instead of the second, her delay in getting onto the crossing would not have exceeded the time the Majority speaks of in her getting started to proceed across. But I must repeat that any pause in starting is irrelevant to the issue of contributory negligence. The borough traffic light was green, the railroad signal light was green, the gates were up, the watchman tacitly invited her to cross, and she started across. What happened before her automobile touched the concrete pavement of the crossing has nothing to do at all with the case because, I repeat and reiterate, that when she started across the crossing every possible device in the world of warning at railroad crossings not only told her and assured her that it was safe to cross, but beckoned and practically urged her to cross. If Mrs. Riesberg had lingered a half hour on River Road before committing herself to the crossing, such a tarrying would have had absolutely no pertinency to the issue here involved. To spend any discussion on Mrs. Riesberg's delay in getting onto the crossing is about as relevant to the issue as discussing a delay she might have had that morning in getting her breakfast.

I said at the beginning of this dissenting opinion that the decision of the Majority is against the law of Pennsylvania. I will now proceed to cite some Pennsylvania railroad crossing cases and we will perhaps see that the law of Pennsylvania is not so devoid of humanity, so sterile of logic, and so empty of regard

for human safety as the Majority Opinion might seem to make it. In the case of *Richardson v. Pennsylvania R. R.*, 338 Pa. 155, Robert Richardson, aged 62, was killed at a railroad crossing in Homestead when he was struck by a railroad train. The trial court entered a compulsory nonsuit on the basis that the decedent failed to look or, looking, failed to take heed that the train which struck him was "at least two hundred feet away." Richardson had completed his traversing of the crossing when the gate came down in front of him, shutting off his exit and when he stopped to get under the gate, the locomotive hit him. One witness testified that Richardson "didn't have time to look back at the train; he was trying to get across." The witness said further that from the time he saw Richardson cross the track he, the witness, was standing some 18 feet from the railroad and that he could see up the track "about 800 feet" in the direction from which the train came.

This Court struck off the nonsuit. Justice MAXEY, in writing the Opinion of the Court, could have been laying down the principles of law for the case at bar. I will italicize and bracket my observations on how those principles cover Mrs. Riesberg's situation: "In order to hold deceased negligent as a matter of law, there would have to be facts showing either that he entered the railroad crossing at a time and place when and where he had timely warning of the oncoming train [*Mrs. Riesberg had no such warning*] or that if the train came into view after he had committed himself to the crossing, he failed to take prudent measures to get out of danger. [*Mrs. Riesberg's first consideration was to save her baby.*] There is no evidence in this record that the deceased saw the train approaching before he committed himself to the crossing. [*Nor is there any evidence Mrs. Riesberg saw the train approaching before she committed herself to the crossing.*] The fact that the gates were up was some indi-

cation that he could safely start across although this court has held that while open safety gates intimate that no train is approaching, they do not relieve one about to cross a railroad from the duty of exercising due care. [*In addition to the open gates, Mrs. Riesberg had the extra assurance of green lights and the watchman that no train was approaching.*] The deceased cannot be adjudged guilty of negligence because he did not escape from his position of danger, for he apparently would have done so had the gates not descended in his pathway. [*Mrs. Riesberg would have been on her way safely had the Carson Street gate not come down in front of her car.*]"

Appellate judges reflect, weigh, calculate, hypothesize and decide in the cool comfort of their chambers but the principals involved in cases they are considering often have had to make their decision in the hot arena of rapidly moving and crushing forces. Split seconds often determine life and death in railroad crossing cases. Justice MAXEY, therefore, spoke wisely, humanely, and in the best traditions of understanding and comprehending jurisprudence when he said in the *Richardson* case: "In deciding whether or not an individual has failed to exercise ordinary care for his own safety, *regard must be had to the exigencies of the situation in which he found himself. The law holds men to prudence of conduct but not to infallibility of judgment.* In passing upon prudence of conduct, the attendant circumstances are important factors. *No man's foresight is required to equal his critic's hindsight.*" (Emphasis supplied).

The Majority Opinion gives no indication of having weighed the fact that the plaintiff here was a woman traveling with a child of tender years and that if, at the moment when she had to make a crucial decision, terror and fright clouded her best judgment, this fact of itself is not contributory negligence as a matter of

law. This terror would never have occurred had the railroad company properly controlled, patrolled and supervised the railroad crossing at the time the accident occurred.

Then there is the case of *Sharpless v. D. L. & W. R.R. Co.*, 286 Pa. 439, where the plaintiff's husband was killed at a railroad crossing upon which he entered when the safety gates were up. The defendant railroad company argued that the open gates were no guarantee that no train was approaching and that the decedent had the duty, in view of the fog present at the occasion, to go on the tracks to ascertain whether a train was on the way. There was a verdict for the plaintiff and this Court affirmed, Justice SCHAFFER stating: "Every traveler on the highway had the right to rely to some extent on this safeguard which the railroad company had provided and, having stopped as this unfortunate man did, *could rest in the assurance that if a train was approaching, the gates would be lowered and, if they were not, that it was safe to proceed.* If the rule were to be laid down that at such a crossing as this, with the gates up, every traveler by automobile or other conveyance must alight after stopping and go ahead on foot to observe the tracks, danger would be increased instead of diminished . . . We have recognized that while raised safety gates do not obviate certain precautions on the part of those approaching a crossing, such as stopping . . . or other precautions . . . *yet they do constitute an invitation to cross which is to be considered by the jury in determining whether the person crossing the tracks exercised proper care according to the circumstances* . . . and in this day of great density of traffic where main highways crossed by railroads at grade are protected with safety gates, the traveler who approaching them finds them raised performs his full duty by stopping, looking and listening, and need not alight from his car

and go forward to further observe." (Emphasis supplied).

In *Johnson v. Director Gen. of R.R.*, 278 Pa. 491, the plaintiff was confronted with lowered safety gates when he arrived at the railroad crossing. They were later raised and he heard the watchman say: "Go ahead." There were four tracks at the crossing. He traversed three of them and was hit on the fourth. He was awarded a verdict. The railroad company argued he was guilty of contributory negligence in failing to see the approaching train since the track was straight for a distance of at least a half mile. There was evidence of fog and darkness. This Court affirmed the verdict, Judge Frazer stating: "We also have the further circumstance that the safety gates, which were down at the time plaintiff approached the tracks, were raised while his truck was stopped and he invited to cross. Although plaintiff was not thereby relieved from the duty to observe reasonable care, *the opening of the gates constituted an intimation that the tracks were free of approaching trains and implied an invitation to plaintiff to proceed.* While he was bound to use reasonable precaution for his safety in passing over the tracks, the raising of the gates was a fact for consideration of the jury in determining whether he exercised proper care under the circumstances . . . *It was the duty of the watchman to know conditions at the crossing and the probable time of arrival of trains* and, further, his position in the tower afforded him a better opportunity for observation than was offered the traveler on the highway. *The latter, consequently had the right to . . . accept the invitation to cross impliedly extended by raising the gates and expressly extended by the watchman;* at the same time, however, performing his duty to take reasonable precaution for his safety." (Emphasis supplied).

Reading this record in the blazing light which the illumination of hundreds of cases tell us that we must read the record, namely, with all inferences favoring the person against whom a nonsuit has been rendered, I come to the conclusion that there is literally nothing in this record which justifies condemning Mrs. Riesberg guilty of contributory negligence as a matter of law. However, allowing for the violent hypothesis that there was such contributory negligence, I believe that the case was still for the jury as to whether the conduct of the railroad company in the circumstances was not such as to constitute wanton negligence. There can be no question that the locomotive crew could see the crossing from a distance of 1500 to 2000 feet since they were traveling head-on into the crossing. It is not known where the train was when Mrs. Riesberg was on the third track, but it is known that no matter where the train was, the engineer or fireman or both could see her and could possibly stop the train before reaching the automobile or at least reduce the velocity of the train enough to make the impact less violent than the one which caused the serious injuries involved.

I believe further that the railroad company could be found guilty of wanton negligence because it allowed travelers to be on the crossing, in fact invited them to enter upon the crossing, when the watchman knew, or should have known, that a train was due on the crossing within the matter of seconds. The train which injured Mrs. Riesberg and child was a passenger train and presumably was traveling on schedule. As I see it, there was no excuse on the part of those in charge of the crossing not to know that the train would pass at the time it did pass. In the case of *Kasanovitch v. George*, 348 Pa. 199, this Court defined wanton negligence as that negligence "which is characterized by a realization of the probability of injury to another (or

at least where the circumstances would cause such a realization to a reasonable man) and a reckless disregard nevertheless of the consequences." A jury could find in this case that such a reckless disregard was evident.

I would, therefore, in conclusion, remand the record to the lower Court for a trial to which Mrs. Riesberg is entitled according to the laws of Pennsylvania, the trial which she has not yet received.