## Johnson, Appellant, *v.* Pennsylvania Railroad Company.

Argued March 16, 1960. Before JONES, C. J., MUS-
MANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused June 6, 1960.

*David C. Suckling,* with him *R. A. House, Jr.,* for
appellant.

*Robert W. Smith, Jr.,* with him *Smith, Best and
Horn,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 4, 1960:

Albert L. Johnson was struck and killed by a loco-
motive at a Pennsylvania Railroad crossing in the bor-
ough of Manorville, Armstrong County, while driving
an automobile, accompanied by his wife, Mrs. Lenore
A. Johnson, who was injured in the same accident. She
brought death and survival actions against the rail-
road company as the result of her husband's death and
filed an additional suit in her own name for her in-
juries. The jury returned verdicts in the sums of $1,-
850 and $15,000 in the death and survival actions, and

$2,500 in favor of the plaintiff in her personal injury suit. The trial court entered judgment n.o.v. in the death and survival actions, declaring that the decedent, Albert L. Johnson, had been guilty of contributory negligence as a matter of law. The verdict in the personal injury suit was affirmed.

Mrs. Johnson, as administratrix of the estate of her husband, appealed from the judgment n.o.v. In considering the justifiability of a judgment n.o.v., the transcript of the record could well be read as if all testimony favoring the verdict-winner stood out in italics. Applying such an appraisement to the evidence, the following narrative warrantedly emerges:

Locust Street in Manorville, an east-west thoroughfare, crosses, at grade, two railroad tracks of the Pennsylvania Railroad, the western track accommodating southbound tracks and the eastern track northbound trains. On the date above mentioned at about 2 p.m., Albert Johnson, his wife sitting beside him as a passenger, was driving his car in an eastwardly direction on this street. When the car arrived at a point about 20 feet from the nearest rail of the southbound track, Johnson brought it to a stop, in obedience to the usual railroad sign warning travelers to stop, look and listen. Looking to the north and to the south the Johnsons saw no trains, and, in that pause, they listened for warning signs of approaching trains. They heard nothing. After this surveillance which assured them it was safe to proceed further, the driver Johnson moved forward again, but at a snail's pace, so slowly in fact that, as Mrs. Johnson later testified, the measure of speed was not recordable by the car's speedometer.

As the car crawled toward the tracks, both Mr. and Mrs. Johnson continued to study the railroad site, particularly looking toward the north because it would be from this direction that any train, as they crossed

the first track, would come. Their view to the north, that is to their left, was a restricted one because of the presence of buildings, three telephone or utility poles and a hedge. At a point 12 feet from the nearest rail, their furthest vision extended no more than from 200 to 250 feet. A short distance beyond the physical obstructions mentioned, the tracks curved to the left, that is toward the west, and disappeared from sight.

As the automobile neared the track, that is 3 feet from the closer rail of the southbound track, a train burst into view from the north, about 150 feet away, traveling at a speed, according to the engineer's testimony (but later estimated to be closer to 50 miles per hour) at 40 miles per hour. The automobile had not yet reached the track, but it was close enough that the overhang of the diesel engine, with an extension of $30\frac{1}{4}$ inches, struck the bumper and swung the car around, carrying it southward along the tracks, and inflicting the mortal and personal injuries already mentioned.

The lower court said in its opinion: "This case is one of a person driving an automobile in front of a rapidly approaching train, which he could have seen if he had looked, and so avoided the accident."

This statement embraces two ponderable errors. (1) Johnson did not drive in front of a rapidly approaching train; he was sideswiped, as we have seen, by the projecting overhang of the locomotive. (2) The geographical location of the crossing was such that, even with Johnson's looking there was no such certainty he could avoid the accident, that a court could declare him guilty of contributory negligence as a matter of law.

On the other hand, the jury could find that if the engineer had blown the locomotive whistle as it approached the crossing, Johnson would not have driven within such proximity of the tracks and thus the colli-

sion would not have occurred. The whistling post along this stretch of railroad track was located 591 feet north of the crossing, but the engineer passed by it in restrained silence.

Photographs introduced at the trial, as well as considerable testimony on the subject, show a garage (referred to as the Costanzo garage) on the northern side of Locust Street and 20 feet west of the first western rail, a hedge fence 19 feet west of the nearest rail, and a telephone pole 13 feet west of the same rail, followed by two other telephone poles on the same alignment. Then, further north, there was another garage (known as the Campbell garage), the southern extremity of which was about 198 feet from the center of Locust Street. These structures and poles innocently but fatally combined to screen an approaching train from the crossing until it got so close to it that the unwarned traveler, if he had reached the tracks, would have no way of escaping destruction.

A railroad company that places a crossing at a point where it cannot be seen by the traveler until he is practically committed to passing over it, cannot use the stop, look and listen sign as a badge of immunity from liability for accidents occurring as the result of non-visibility. Of what value is it to stop if stoppage does not allow the traveler to see the train, and of what value is it to listen, if the railroad fails to sound warning signals which perilous crossings demand?

The railroad company in the case before us knew or should have known of the physical obstructions here enumerated, which, by chance arrangement formed a visual barrier to the traveler so that he could not see far enough down the track to be adequately warned of an approaching train. Everyone knows that a small object in the immediate foreground of one's vision can completely black out an enormous object in the distance. A butterfly winging by a yard away can easily

hide from view an elephant 100 yards away. Lifting one's hand to the sky one can shut off from view the omnipresent and fiery sun. In *Baker v. P. R. R.,* 369 Pa. 413, the trial court entered judgment n.o.v., in a case where the plaintiff's decedent had been killed on a railroad track. This Court reversed, negating the conclusion of the lower court that the decedent was guilty of contributory negligence as a matter of law. In describing the locale of the accident, Justice JONES (now Chief Justice) said: "Because of the angle at which the hood of an automobile, approaching the crossing from the south, is elevated, it is impossible for a driver to see a man standing in the middle of the road at the far side of the crossing . . . The driver's view to the east, approaching the crossing from the south, is similarly obstructed by the rising elevation of the road as well as by a number of industrial buildings and a passenger shed which, at the time of the accident, stood within 14 feet of the south (or outside) rail of track No. 1 and close by the road. From this point, the view to the east is further interfered with by a series of telegraph poles planted on a line parallel to the tracks 8 feet south of the southernmost rail . . . Further difficulty attended an approach to the crossing from the south at nighttime because of the confusing background to the east created by the lights of cars moving westward along the Ohio River Boulevard . . ."

It will thus be seen that the law recognizes that physical conditions at or near a railroad crossing may so mask the crossing itself that a traveler may not be held to the same measure of care which he is bound to exercise when he has a clear and unobstructed view for a sufficient distance and time to be properly informed of the danger ahead.

The lower court says in its opinion: "The crossing was undoubtedly a dangerous one, but it was well known to both the occupants of the automobile. In

making such a crossing it is to be observed that the more dangerous a crossing is, the greater must be the vigilance exercised."

But the vigilance was not to be confined to motorists. The railroad company should have exercised vigilance also. That the occupants of the automobile may have known that the crossing was a dangerous one did not excuse the locomotive engineer from blowing his whistle to warn the public of the train's approach. Whatever may have been the Johnsons' familiarity with the crossing, they were still helpless in the face of the physical impediments which cut off a clear view of the tracks. They were still dependent on the audible warning which the public had the right to expect from the railroad company.

It is a strange thing that the court below in its opinion does not discuss at all the most important feature in the case, namely, the failure of the railroad engineer to sound a warning of his approach. This was a subject testified to at great length at the trial. Not to mention the matter at all in an opinion entering a judgment n.o.v. when the jury found that the defendant was negligent, is like doing the play *Macbeth* without Banquo's ghost.

A railroad company may, in some instances have no choice as to location of crossings, since many factors enter into determining a right of way, but where, as here, physical conditions visually blanket the speeding train until several short seconds before it sweeps, like a steel and iron tornado, into a crossing, a due responsibility for the safety of mankind dictates that something be done to alert the public of the omnipresent danger—over and above that of asking it to stop, look, and listen.

The lower court cites *Hepps v. Bessemer & L. E. R. R. Co.*, 284 Pa. 479, in support of its decision and says that the facts in that case are "almost identical

with the case now under consideration." The "almost-ness", however, is removed by as much a distance as 450 feet. Our Court said in that case that the driver and passenger in the automobile which was struck by a train "could see the distance referred to along the rails and the evidence discloses that the track was straight for *at least* seven hundred feet." (Italics supplied). In spite of this long distance, as compared to the shortness of view in this case, the driver said that he did not see the train until it was less than a 100 feet away. The maximum view in this case, as already stated, was only 250 feet.

Defendant's counsel argues in his brief that the decedent Johnson, in order to avoid the collision, "needed to do nothing at all but take his car out of gear and let it drift down the grade which he had ascended, or place the car in reverse and move it, under its own power." But extrication from the deadly peril was not so simple. The train was seen when it was only 150 to 200 feet away, and it was moving at the rate of at least 40 miles per hour, probably more, since (although it consisted only of a locomotive, one car, and caboose) it traveled 500 feet after the collision before it stopped. It was thus eating up distance at about 60 feet per second, leaving Johnson less than three seconds in which to perform the complicated operation described by defendant's counsel. The grade referred to was only 7½%, thus not so precipitous as to cause a car to back instantaneously, assuming that the driver, after recovering from the shock of what his eyes told him, could have thrown the engine out of gear or into reverse—all in less than three seconds.

But, assuming that three seconds would have been ample time within which to arrest the forward movement of a car, reverse it, and get it moving over a snow-covered road, while one's mind was benumbed in the face of an oncoming holocaust, the driver could

still not be charged with contributory negligence, *as a matter of law.* When circumstances conspire to throw one into a state of peril through no fault of his own, he cannot be held accountable for an error in judgment if the emergency allows no time for seasoned reflection. The most that can be said in such a desperate situation is that a jury shall determine whether the endangered person's reactions were so contrary to those of a reasonably prudent person that he must be held responsible himself for the harm or death which strikes him down. Certainly the law would not and should not declare him at fault as a matter of absolute fiat.

Defendant's counsel's mathematical calculation as to how Johnson could have held back the jaws of the steel trap snapping shut upon him is of the same character as the one advanced in the case of *Mills v. Pennsylvania Railroad Company,* 284 Pa. 605, 608, where this Court disposed of the argument as follows: "Although the mathematical calculation suggested by appellant's counsel apparently demonstrates that the truck driver had time to cross to the opposite side, unless he started after the train came in sight, such precise timing of the relative movements of the truck and train and close calculation of time and space, at best only an approximation, *make the margin of safety such a narrow one that a traveler should not be held accountable, as a matter of law, for the resulting accident.*" (Emphasis supplied.)

Again, on the same subject, this Court said in *Marfilues v. Philadelphia and Reading Railway Company,* 227 Pa. 281, 284: "The problem was what to do and how to do it, and if in the emergency suddenly arising he failed to do what, after mature deliberation, would seem to be the wisest thing, he is not to be charged with negligence. He was entitled to a reasonable opportunity to *think and act.*" (Emphasis supplied.)

And, of course, in the scales of balance determining this particular issue of contributory negligence, we must place the not inconsiderable weight of the presumption that the decedent used due care.

One final incongruity is to be noted in the decision of the lower court. It affirmed the verdict of damages awarded Mrs. Johnson for her personal injuries by stating that she was free from contributory negligence, explaining: "If Mrs. Johnson observed its [train] approach two hundred feet away she would have less than four seconds to give a warning, and if one hundred fifty feet away less than three seconds. The train traveled five hundred feet after the collision before coming to a stop, and could well have been traveling at a rate of speed greater than forty miles per hour. She testifies that the train was there and the collision occurred before she had time to utter a word, and further, that she definitely felt they were back a sufficient distance from the track to avoid a collision."

The oncoming train, at the moment of crisis, was, obviously, as close to the automobile for Mr. Johnson, as it was for Mrs. Johnson, and if Mrs. Johnson did not have time to make an outcry before the train smashed into the automobile, certainly Mr. Johnson would have had even less time in which to change gears and go into reverse on an icy and snow-covered road. Thus, there is no reason why the issue as to whether Mrs. Johnson was guilty of contributory negligence should have been left to the jury, and the same issue, insofar as it appertained to Mr. Johnson, should have been taken away from the jury.

And as a concluding word it will be stated that to affirm Mrs. Johnson's personal injury verdict is to acknowledge negligence on the part of the railroad. The negligence which injured Mrs. Johnson can only be the same negligence which killed Mr. Johnson, namely, the failure of the railroad company to exercise

the required degree of care required at railroad crossings.

The judgment of the court entered in favor of the defendant is reversed and is here directed to be entered in accordance with the verdict of the jury.