412 A.2d 147

**Yvonne R. BUCHECKER, Administratrix of the Estate of Eugene T. Buchecker, Deceased,**

v.

**The READING COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued June 25, 1979.

Filed Oct. 5, 1979.

36

38

40

Jan E. DuBois, Philadelphia, for appellant.

Jeffrey M. Stopford, Philadelphia, for appellee.

Before WIEAND, ROBINSON and LOUIK, JJ.*

ROBINSON, Judge:

This is an action brought by the appellee, Yvonne R. Buchecker, Administratrix of the Estate of Eugene T. Buchecker, deceased, under the wrongful death and survival statutes to recover for the death of her husband, who was killed in a collision with a train of the appellant railroad at a grade crossing on State Highway Route 309. After a trial, the jury returned a verdict in favor of the appellee for $95,000.00 in the wrongful death case and for $405,000.00 in the survival action. The lower court denied appellant's post trial motions for a judgment n. o. v. and for a new trial and the appellant appealed.

Viewing the evidence in a light most favorable to the verdict-winner, as we are required to do, *Glass v. Freeman,* 430 Pa. 21, 240 A.2d 825 (1968); *Kaminski v. Grassi,* 237 Pa.Super. 478, 352 A.2d 80 (1975), the following facts ap-

* Judge OTTO P. ROBINSON of the Court of Common Pleas of Lackawanna County, Pennsylvania, and Judge MAURICE LOUIK of the Court of Common Pleas of Allegheny County, Pennsylvania, are sitting by designation.

pear: The grade crossing accident in which appellee's decedent was killed, occurred on Wednesday, February 4, 1970 on State Highway Route 309, approximately three miles north of the City of Allentown where a single track of the appellant railroad crosses the highway. Route 309 is a major four lane highway running in a north-south direction; appellant's single track freight line runs in an east-west direction. The collision took place at approximately 7:57 A.M. o'clock during the morning "rush hour"; traffic was heavy as it usually is at this time. Appellee's decedent was on his way to work in Allentown and was driving on the southbound lanes; the train was proceeding in an easterly direction. The posted speed limit of Route 309 at the point was 60 miles per hour.

At the time of the impact the decedent was alone in his car and was driving in the left southbound lane at 40 miles per hour; appellant's train was travelling at 29 miles per hour. The front left of appellant's engine hit the right front of decedent's automobile and carried it 900 feet east of the area of impact. A car operated by one Nancy Horne Chetry proceeding in the right southbound lane parallel to decedent's vehicle and slightly ahead of it was also struck by the engine.

The only warning devices for vehicles in southbound traffic connected with the crossing were a state highway sign marked "R.R.", 220 feet north of the tracks; a cantilever extending from a pole at the side of the highway over the same on which were mounted flashing red lights furnished by 18 and 10 watt bulbs; a crossbuck fastened on the side pole with the words, "Railroad Crossing" and another sign also fastened to the side pole stating, "Stop on Red Signal". The flashing red lights, if functioning correctly, were designed to activate by relay mechanisms when tripped by an eastbound train 1,150 feet from the crossing.

The railroad tracks as it came eastward to the southbound lanes of Route 309 proceeded through a deep earthen cut and large embankments bordered the tracks on both sides. The embankment on the north side of the tracks obstructed all views of rail traffic by motorists approaching the cross-

ing in the southbound lanes of Route 309. The police officer in charge of the investigation of the accident estimated the height of the north embankment at 10 feet; appellant's claim adjuster measured it west of the crossing along the tracks at 8 feet, 3 inches.

A southbound vehicle operator on Route 309 could not have a clear view of the tracks westerly until the front bumper of his vehicle was three feet from the north rail. With the bumper 7 feet, 8 inches north of the tracks, the driver would be 16 feet, 3 inches and would have an unobstructed view westerly for sixty feet. The overhang of the train engine and cars, is two feet, six inches. To have an unobstructed view of the eastbound tracks at the crossing, a motorist would have to stop his car six inches north of the overhang of the oncoming train; to stop five feet north of the oncoming train, the motorist would have an unobstructed view of only sixty feet. Expert testimony in the case established that a vehicle moves 1½ feet per second for every mile per hour of speed. Thus a southbound motorist at 40 miles per hour would travel that five feet in ½ of a second.

Nancy Horne Chetry, a driver on the southbound lane, hereinbefore referred to, stated that she traversed the crossing 500 times a year, for four years and never saw a train. She said the morning sun was in the center of the highway just above the horizon. Mrs. Chetry testified that the bright light "sort of distorted your vision"; "it wasn't that you couldn't see, but it was like the sun distorted it." The witness approached the crossing in the rightbound lane going 40 miles per hour. Decedent's car was slightly behind her in the left lane. Several vehicles were in front of Mrs. Chetry and none slowed, braked or stopped at the crossing. Mrs. Chetry stated that she saw nothing, neither train or flashing lights and heard nothing until the train whistle sounded at the instant she was struck in the rear, spinning her vehicle into the northbound lane.

Frank Stearn was driving south ahead of Mrs. Chetry, said he only saw a train on the crossing once or twice a year.

Stearn's radio was off, he had no hearing problem, his window was open and he heard no sound until the blast of a train whistle just as he passed over the tracks. He observed the collision of the train with Mrs. Chetry's Volkswagon in his rear view mirror. Before this day he had observed flashing lights at the crossing, but they did not flash on this day of the accident. He stated, "I firmly believe the light was not on. No one can convince me that light was flashing."

Randy Diefenderfer, a motorist on the northbound lane, said he saw flashing signals from a hill one-quarter of a mile south of the crossing. His radio was not working, his hearing was unimpaired and his left window was "cracked open", and he heard no sound from the train until he stopped 50 feet from the tracks. Mr. Diefenderfer said he could not see the train until it actually entered the intersection.

Appellant contends that it is entitled to a judgment n. o. v. (a) because the trial judge refused to apply the stop, look and listen rule to the case, and (b) that there was no evidence to support the verdict against the appellant.

Appellant also contends that it is entitled to a new trial, (a) because the trial judge refused to instruct the jurors on the stop, look and listen rule and read appellant's points for charge on the subject, nos. 13, 14, 15, 17, 18, 20, 21, 27, and 33 to the jury; (b) the trial judge failed to apply the 20 mile speed limit imposed by the Vehicle Code, 75 P.S. 1002(b)(3), and instruct the jury thereon; (c) the trial judge erred in instructing the jury on the sudden emergency rule; (d) the trial judge erred in refusing points for charge relating to impairment of vision; (e) the trial erred in permitting evidence relating to different safety precautions in effect at other crossings; and (f) that the verdict was excessive and the jury disregarded the instructions on the survival and wrongful death statutes.

## Motion for Judgment N.O.V.

Appellant relies heavily upon the rule that requires a motorist to stop, look, and listen before entering upon a

railroad crossing. A failure to comply with the rule constitutes contributory negligence. See *Tomasek v. Monongahela Rwy. Co.*, 427 Pa. 371, 235 A.2d 359 (1967); *Riesburg v. Pittsburgh and L. E. R. R. Co.*, 407 Pa. 434; 180 A.2d 575 (1962); *Ramsey v. Baltimore and Ohio R. R.*, 336 Pa. 468, 9 A.2d 348 (1969). It is undisputed that appellee's decedent did not stop before entering the crossing. Appellant contends that decedent was therefore negligent as a matter of law that recovery is precluded. Under our case law, the driver of a motor vehicle must stop, look and listen before entering on a railroad crossing. *Riesburg v. Pittsburgh & Lake Erie Railroad*, 407 Pa. 434, 180 A.2d 575 (1962). *Geelen v. Penna. R. R. Co.*, 400 Pa. 240, 161 A.2d 595 (1960), and he must continue to look and listen until he has passed over the crossing. *Kolich v. Monongahela Rwy. Co.*, 303 Pa. 463, 154 A. 705 (1931). A failure to do so constitutes contributory negligence as a matter of law, *Tomasek v. Monongahela Rwy. Co.*, (supra). Where the driver of a motor vehicle is killed at a railroad crossing, a presumption arises that he exercised due care and did stop before committing himself to the crossing, but this presumption is rebuttable. See *Tomasek v. Monongahela Rwy. Co.*, (supra). The older cases support the appellant's position here.

However, it is clear that in recent years, our appellate courts, as the opinion of the lower court reminds, "have moved away from the absolutist posture that characterized" the former application of the rule.

The most recent decision on the stop, look, and listen rule is *Evans v. Reading Co.*, 242 Pa.Super. 209, 363 A.2d 1234 (1976). The facts in that case are somewhat similar to those here. The decedent in *Evans* did not stop his truck before driving on the railroad tracks. A crossbuck and flashing signals preceded the crossing. Employees of the railroad testified that the train's whistle and bells were sounded in advance of the crossing and that the warning lights were working at the time of impact. For the plaintiff, other motorists testified that the visibility was greatly reduced because of the presence of foliage and a strong glare produc-

ed by the rising sun and these witnesses testified that prior to the accident they heard no whistle or bell and saw no warning lights. We held in *Evans* that the defendant there was not entitled to judgment n. o. v. The *Evans* court stated: "While the duty to stop, look, and listen has become a rule unto itself, it is still governed in its application by the more general dictates of the contributory negligence doctrine. One who fails to stop, look and listen will not be precluded from recovering if his failure was not contributorily negligent i. e., recovery will not be precluded where the failure was not negligent or where it was not a contributing cause." 242 Pa.Super. at 214; 363 A.2d at 1236.

Also, in *Evans*, we said: "Viewing the record with these concepts in mind, we cannot say that the lower court erred in denying appellant's motion for judgments N.O.V. The jury in this case could have found that due to the sun or the foliage or both, the decedent did not see the crossing or did not see it until it was too late to stop. Under the circumstances, the decedent's failure to stop, look, and listen would not constitute contributory negligence." 242 Pa.Super. at 215, 363 A.2d at 1237. Moreover in *Geelen v. Pennsylvania Railroad Co.*, 400 Pa. 240 at 248, 161 A.2d 595 at 600, the Supreme Court significantly stated: "It would appear to us that decedent's failure to stop before entering upon the crossing, did not under the unusual circumstances existing here, contribute to the accident. Had he looked at the time, he could not have seen the train because, at that moment, the train was not yet around the bend, it was in fact out of possible sight thousands of feet away." The court held that contributory negligence does not defeat recovery unless the injured person's negligence was a contributing cause of the injury.

In *Johnson v. Pennsylvania Railroad Co.*, 399 Pa. 436, 160 A.2d 694 (1960) the failure to stop, look, and listen was held not to constitute contributory negligence where defendant would not have seen the danger even if he had "stopped, looked and listened". The court said that a railroad company "cannot use the stop, look, and listen sign as a badge of

immunity from liability occurring as a result of non-visibility. Of what value is it to stop if stoppage does not allow the traveler to see the train, and of what value is it to listen if the railroad fails to sound warning signals which perilous crossings demand?" 399 Pa. 440, 160 A.2d 696. "It will thus be seen that the law recognizes that physical conditions at or near a railroad crossing may so mask the crossing itself that a traveller may not be held to the same measure of care which he is bound to exercise when he has a clear and unobstructed view for a [significant] distance and time to be properly informed of the danger ahead." 399 Pa. 441, 160 A.2d 697.

"Whatever may have been the Johnsons' familiarity with the crossing, they were still helpless in the face of the physical impediments which cut off a clear view of the tracks." 399 Pa. 442, 160 A.2d 697. The facts of *Johnson* are similar to the facts of the instant case and the propositions of law governing that case apply with equal vigor here to permit recovery.

So too, in *Fallon v. Penn Central Transportation Co.,* 444 Pa. 148, 279 A.2d 164 (1971) where the view of any oncoming train was obstructed until an automobile was dangerously close to the tracks and there was evidence that no warning signal was given, recovery for the plaintiff was upheld and the failure to stop by itself was not a bar to recovery.

It has been pointed out elsewhere in this opinion that the railroad tracks were in a deep cut with a high embankment on the northside so that a southbound motorist could not obtain an unobstructed view of the tracks until the front bumper of his car was three feet from the nearest rail and that the overhang of the train (engine and freight cars) is two feet, six inches allowing only a six inch safety margin for the motorist. The "first view" position established by the appellant places the front bumper of a car 9 feet from the train. The lower court pointed out that the "whistle board was located 1,484 feet west of Route 309; that the train was travelling approximately 30 miles per hour and an eastbound train would travel the distance in 33 seconds. If

the flashers were activated when the train was 1150 feet from the crossing the flashers would be operating 25½ seconds before the train reached the highway. If the customary signal was used (two long, one short, two long) there would be 5 to 10 second periods when no whistle was sounded. Furthermore, the sound warnings, by whistle and bell, if given, were given in a deep ditch or cut where the sound waves could only be impeded by the sides of the embankment and so deflected that they could not adequately warn the southbound motorists on Route 309 and the factor was undoubtedly considered by the jury.

■ The court below properly held that the decisions in *Evans, Johnson, Geelen* and *Fallon* took the case out of the stop, look, and listen rule. It was as a practical matter impossible to look westerly down the tracks from a place of safety and the failure of plaintiff's decedent to stop under the circumstances did not bar recovery. Furthermore, when we consider the evidence that no motorist ever stopped in the absence of a flashing red signal; evidence that the signal was not operating at the time; evidence that the signals were so placed that the light of the rising sun affected the visibility of the signals; evidence that the appellant railroad placed a sign on their side pole stating "stop on red signal"; and the unreliability of the sound warnings, these considerations preclude the conclusion that the decedent did not as a matter of law conduct himself as an ordinary prudent, reasonable man under the circumstances.

■ The appellant argues there was no evidence to support the verdict because the jury in finding for the appellees, gratuitously found no negligence on part of the train crew. However, that does not, in any sense, mean that the appellant railroad was not negligent. Appellant overlooks the overwhelming evidence which refers to the inadequacy of the crossing protection afforded southbound travellers on Route 309. There are several issues, independent of the conduct of the train crew, concerning negligence of the appellant: (1) Whether the flashing signals were improperly

installed so that the rays of the early sun on the warning device could mislead southbound motorists or fail to convey the warning. (2) Whether the appellant knew or should have known that physical obstructions formed a visual barrier to the traveller so that he could not see far enough down the tracks to be adequately informed of the approaching train. (3) Whether physical obstructions impeded the auditory warnings so that they were inadequate. We have stated that the evidence and all reasonable inferences arising therefrom must be viewed in a light most favorable to the verdict-winner. *Skoda v. West Penn Power Co.*, 411 Pa. 323, 191 A.2d 822 (1963); *Hargrove v. Frommeyer and Co.*, 229 Pa.Super. 298, 323 A.2d 300 (1974). The jury found that a railroad crossing which was designed in such a manner as to give motorists on the four lane highway no adequate warning, auditory or visual of the train's approach was not adequate protection to the motorists on Route 309 and that appellant was negligent for failing to provide it.

The evidence in this case sufficiently established that appellant maintained an inherently dangerous railroad crossing in a manner that was inadequate and below standards that due care would require for the safety and protection of travellers on the southbound lanes of Route 309. It was for the jury to resolve these matters.

The motion for Judgment N.O.V. was properly denied.

### Motion for a New Trial

Appellant contends it is entitled to a new trial because the trial judge refused to charge on the stop, look and listen rule and read appellant's points for charge nos. 13, 14, 15, 17, 18, 20, 21, 27, 33. The trial judge properly refused because it would have required a finding for appellant since it was undisputed that the decedent did not stop. The court did, however, inform the jury that there was such a rule of law but that it did not apply in this case.

The appellant relied entirely on the stop, look and listen rule in its defense. We discussed this area of the case in connection with the motion for judgment n.o.v. The old

law required a motorist to stop, look and listen before entering upon a railroad grade crossing and failure to do so barred recovery. We have noted before, however, that in recent years our appellate courts have moved away from the former application of the rule, in the decisions in *Evans v. Reading Co.*, (supra); *Johnson v. Pennsylvania Railroad Co.*, (supra); *Geelen v. Pennsylvania Railroad Co.*, (supra); and *Fallon v. Penn Central Transportation Co.*, (supra). We said that these decisions took this case out of the stop, look, and listen rule. The rule today is governed by the more general dictates of the contributory negligence doctrine and one who fails to stop, look, and listen will not be precluded from recovery where the failure is not negligent or where it was not a contributing cause. What we said at length in disposing of the motion for judgment n.o.v. applies here also and is incorporated by reference. The trial judge did not err in refusing to charge as appellant requested.

■ Appellant complains that the trial judge should have charged the jury that the decedent was required to operate his car at a speed of not more than 20 miles per hour for 200 feet before he reached the grade crossing. We do not agree for two reasons: (1) the 20 mile speed limit of section 1002(b)(3) of the Vehicle Code of 1959 P.L. Section 1002 did not apply to Route 309, and (2) there was no evidence that the speed of decedent's vehicle was a contributing cause of the accident. While section 1002(b)(3) provides for a 20 mile per hour speed limit for 200 feet on approaching a grade crossing, it is clear that section 1002(b)(8) provides that the "secretary of Highways may . . . establish certain speed zones with a 60 mile an hour speed limit on state highways outside of business and residence districts". The undisputed evidence here is that Route 309, a limited access, four lane, state highway had a posted speed limit of 60 miles per hour at the time of the accident. The posted 60 mile speed limit superceded the 20 mile limit of section 1002(b)(3). The posting of the 60 mile speed limit establishes that the secretary of Highways set that limit and there is no evidence that he did not properly do so. It is the limit that governed

the speed of decedent's car. Appellant's contention has no merit.

The appellant contends that the trial judge erred in charging upon the "sudden emergency rule". The trial judge charged upon the assured clear distance rule because such instructions were required by the decision in *Evans v. Reading Co.*, supra, 242 Pa.Super. 209, 363 A.2d 1234 (1976) and *Unangst v. Whitehouse*, 235 Pa.Super. 458, 344 A.2d 695 (1975). Appellant concedes that the trial judge properly charged the jury on the duty of an operator to have his vehicle under such control as would permit him to stop within an assured clear distance ahead. Appellee thought the charge was not required. Appellant, however, excepted to the court's instructions that there are exceptions to the assured clear distance ahead rule which make it inapplicable.

Appellant argues that the decedent was not confronted with an emergency because, undisputedly, he had a clear, unobstructed view of the crossing for more than one-fourth (¼) of a mile stretch leading to the tracks and therefore could not have been surprised by the sudden appearance of the *crossing*. The fallacy in this argument is that the crossing was not an obstacle. The obstacle or obstruction on the highway was the appellant's train.

Under the evidence, the eastbound train could not be observed by the southbound decedent until an instant before impact. While the previous assured clear distance may have been one-fourth (¼) of a mile, giving decedent ample time to stop before colliding with any obstacle, there was no such obstacle within or approaching the crossing in decedent's view until the instant before the collision. In *Unangst v. Whitehouse*, 235 Pa.Super. 458, 459, 464, 344 A.2d 695, 698 (1975), we said: "[Where] an obstacle is encountered by a driver which is in his line of travel, the distance to the obstacle becomes the time and distance limitation at the moment the obstacle comes into view." Since there was evidence that the "moment that the (train) came into view" was an instant before the collision, there clearly was a sufficient basis to support the court's instruction with re-

spect to the applicability of the sudden emergency exception to the assured clear distance ahead rule. After instructing the jury on the assured clear distance rule, the trial judge would have committed reversible error under the holding in *Unangst* had he not also instructed them as to the circumstances under which the rule would not apply.

In *Unangst v. Whitehouse*, 235 Pa.Super. at 464, 465, 344 A.2d, at 698, 699, we also said: "[W]here a sudden and clear emergency arises *inside* the range of the previously assured clear distance, the rule has been held inapplicable (citing cases). A sudden and clear emergency may be a dust cloud, a moving object, a sudden blocking of the road, the sudden swerving of other vehicles or the aforementioned blinding lights. . . . Where a sudden emergency arises, this Court has held that a court may not charge the jury as to the assured clear distance rule. . . . In such a circumstance the driver has already mentally cleared the distance ahead and the sudden interjection of an instrumentality within the range thereof is not within the specific duty imposed by the rule."

■ However, where the evidence leaves some doubt as to whether an emergency situation existed, wholly independent of and not created by the plaintiff's own acts of negligence or recklessness, it is incumbent upon the trial judge to submit the issue to the jury for its determination. *Reifel v. Hershey Estates*, 222 Pa.Super. 212, 295 A.2d 138 (1972). This is precisely what the trial judge did in this case.

We cannot say that the trial judge erred in this portion of the charge; neither can we say that the appellant was in any way prejudiced.

Appellant next contends the court erred in refusing to submit points for charge 25 and 26 which read as follows:

"25. A motorist whose vision is obscured by sun, fog, smoke or other vision obstructing elements must either stop or proceed at such rate of speed that he would be able to stop in time to avoid striking any object in the road ahead.

26. If you find that the decedent's vision was impaired by sunlight to such a degree that he could not see the *railroad crossing* or the flashing crossing lights and that in light of the physical circumstances this was not a condition which came upon the decedent suddenly but one which he was aware of for an appreciable length of time as he approached the crossing, and despite this knowledge he failed to stop at the crossing, the decedent was guilty of contributory negligence and plaintiff cannot recover." (emphasis added)

■ As to point 25, the substance of the requested point was adequately covered by the trial judge in the portion of the general charge relating to the assured clear distance rule.

As to point 26, the plaintiff's evidence and contention was that the crossing and overhead flashing crossing lights could be seen but that the *color* of the signal could not be distinguished because of the sunlight.

■ Thus this point included therein an issue that was not in dispute and not relevant to the determination of decedent's contributory negligence. As pointed out earlier in this opinion, the relevant issue was not whether the *crossing* could be seen but rather whether the *train* proceeding towards and into the crossing could be seen. To have read the point as written would have confused and misled the jury into the mistaken legal assumption that the decedent's admitted ability to see the crossing, coupled with his failure to stop at the crossing under the circumstances embraced in the point, would in and of itself constitute contributory negligence as a matter of law. Under the evidence in this case, the issue of contributory negligence was for the jury. A trial court may properly refuse to read a point as submitted, which would be tantamount to a direction to find a party negligent when the record does not justify such a direction. *Amati v. Williams*, 211 Pa.Super. 398, 236 A.2d 551 (1967).

The court in other portions of its charge did instruct the jury that in determining whether decedent was negligent, there was imposed upon him a duty "to be cautious and to use care when weather conditions interfere with his vision". The court further instructed the jury that "the poorer the visibility at a railroad grade crossing, the greater the duty of vigilance on the part of the driver of an automobile approaching the crossing" and that the jury should consider whether "the sun had any effect on the ability of (decedent) to see the *color* of the signal, and whether, with the sun in his eyes, he should have further reduced his speed." Thus the relevant portion of the requested instruction was adequately covered in the general charge.

In determining whether or not reversible error was committed by the trial judge, an appellate court considers the charge as a whole. *James v. Ferguson*, 401 Pa. 92, 162 A.2d 690 (1960); and where the point requested is sufficiently or adequately covered by other instructions, the trial court commits no reversible error in declining to read to the jury a specific point for charge. *Wilson v. Penna. R. R. Co.*, 421 Pa. 419, 219 A.2d 666 (1966).

The trial court committed no error in refusing to read points 25 and 26.

Appellant complains of the admission of evidence in respect to other grade crossing protection devices. On cross-examination, plaintiff's counsel asked the fireman on the train about other types of crossing signals or protection devices along his run. The trial judge overruled appellant's objections thereto on the ground that the fact that some of the crossings had gates went to the feasibility of other safeguards used by and available to the appellant railroad. Appellant also objected to plaintiff's counsel's reference in his closing to the existence of other feasible types of crossing protections. However, plaintiff's counsel did not argue that the law imposed a duty on the railroad to choose a crossing protection of a *particular* type, but only of a type which would give adequate notice of a train's approach.

Appellant argues that the holding in *Cummings v. Pennsylvania Railroad*, 301 Pa. 39, 151 A. 590 (1930) precluded such cross-examination and mention of specific crossing protection devices. *Cummings* merely held that it was error for the trial judge to give an instruction the effect of which would permit the jury to infer negligence from the mere absence of a flagman or watchman. This very case noted that it is proper for the jury to take into consideration the physical conditions at the crossing, the extent of use by the public, the nature of the surroundings, and other matters tending to show exceptional dangers incident to the particular crossing to determine whether the railroad performed its duty towards persons using the highway. The court in *Cummings* further stated that the rule that there is no common law duty to place a flagman or safety gates at a crossing may be "departed from . . . to the extent of permitting the *absence of a flagman or gates to be considered by the jury, with other facts, in determining whether or not under all the circumstances the railroad was negligent.*" (Emphasis supplied) 301 Pa. at 42, 151 A. at 591.

While the failure to provide a specific safety device is not negligence per se, this rule does not relieve the railroad company from the duty of providing one at a crossing sufficiently dangerous to require it. "It is generally held that the absence of gates, gongs, or other safety devices may be submitted to the jury, along with the other evidence in the case, for the purpose of enabling them to determine whether, under the circumstances the railroad was guilty of negligence under the particular circumstances disclosed by the evidence at the time of the accident, although under the particular circumstances disclosed by the accident, submission of the question to the jury may not be warranted. Submission of the question of negligence to the jury does not permit them to determine what particular means railroads should have used but whether under the circumstances the means used were sufficient to constitute due care." 65 Am.Jur.2d § 508, Railroads (citing *Cummings*, supra). See *Dostal v. Baltimore & Ohio R. R. Co.*, 189 F.2d

352, 353, 3rd Cir. (1951). Thus, the absence of the safety gates may be considered by the jury along with other evidence in this case.

■ Finally, even assuming the trial judge may have been in error in permitting the cross-examination of appellant's witness as to other types of crossing protection along the particular run here involved, the error was *harmless* and was cured by the court's incorporation in its charge of the very language contained in appellant's points 37 and 38. The charge of the court in this respect was as follows:

"In determining whether or not the Reading Company was negligent in this case, you must consider whether, under all the circumstances, the Reading Company exercised reasonable care.

When considering that question, you should keep in mind the general rule that there is no common law duty on the part of the Reading Company or any other railroad to place any particular types of warnings at grade crossings, but what is required is that the precautions at grade crossings be reasonable under the circumstances.

In determining whether or not the Reading Company is negligent in this case, the law does not permit a jury to decide in what manner a railroad company should perform its duty to the public at a grade crossing and to substitute its judgment for the Reading Company's proper officers. You are merely permitted to pass on the question of whether, under all the circumstances of the case, the Reading Company performed its duty to persons upon the highway."

The Court thus specifically cautioned the jury there was no duty on the part of appellant to place any particular type of protection at the crossing. It is further noted that no exception was taken to the above instructions for the obvious reason that they were given at the request of appellant itself. Thus, the error, if any, did not prejudice the appellant in light of the subsequent curative instruction which eradicated and specifically eliminated from the jury's consideration any duty on the part of the Railroad to maintain any

particular type of protection at its crossing. See *Wolverine Glass Co. v. Miller*, 279 Pa. 138, 123 A. 672 (1924). Moreover, since it is a matter of general knowledge that some railroad crossings are equipped with automatic gates and since the members of the jury are not expected to disregard their general knowledge of matters in their deliberations, the information elicited by the cross-examination was harmless.

## Damages

Appellant argues that it is entitled to a new trial because (1) The verdict is excessive and (2) the jury reversed the awards in the wrongful death and survival actions. We do not agree.

The parties do not dispute that the measure of damages in a survival action is the probable earnings of the deceased during his life expectancy; from which is deducted the probable cost of maintaining himself and his family had he lived; and (3) reducing the balance to its present worth. See *Murray v. Philadelphia Transportation Co.*, 359 Pa. 69, 58 A.2d 323 (1948); *Pezzulli v. Dambrosia*, 344 Pa. 643, 26 A.2d 659 (1942); *Jenkins v. Pennsylvania R. R. Co.*, 220 Pa.Super. 455, 289 A.2d 166 (1972). The item of conscious pain and suffering is not involved here; the funeral bill was $2,000.00.

The decedent, Eugene T. Buchecker, born on October 19, 1935, was 34 years of age at his death and was survived by his wife, age 31, and three children, ages 4, 8, and 13. He was employed as a truck helper by the Hess Department Store. His earnings for the last year of his life, regular plus overtime, were $10,377.00. Decedent was a member of the Teamsters Union and the labor contract with Hess's provided for periodic increases until decedent was getting $7.77 per hour. Appellee's actuary, David Bunin calculated the total of decedent's probable past and future net earnings reduced to present worth to be $373,599.00. This figure presumes decedent would have retired at age 65 and his earnings would stop. However, one's earning capacity does not terminate at 65 and many over that age can and do earn. Decedent's net earnings would have increased as his children

became self-sufficient. The trial judge pointed out that it was obvious all of decedent's earnings went to family expenses. The appellant complains that the actuary did not deduct the cost of maintaining his family. It is clear, however, that the jury did since it came in with a verdict of $95,000.00 which it obviously intended to be the award in the survival action. This award does not appear to be excessive and does not disturb the conscience of the court.

In the wrongful death action, the bulk of decedent's net earnings of $373,599.00 would have gone to the support of his family for shelter, food, clothing, medical care, education and recreation. Appellee was entitled to recover the loss of such support in the wrongful death action. Appellee was also entitled to recover for the value of services, society and comfort the family would have received had decedent lived. The evidence set forth loss of services in guidance, tutelage, and moral upbringing decedent provided for his children. Decedent provided recreation for his family in the form of bowling, attending amusement parks, theaters, picnics and similar recreational activities. Decedent worked fixing his home, made a train and gymnasium for the children and played games with them. He took them on trips to New York, Philadelphia and the Jersey Shore. In the cities they visited the zoos and museums. In season, he took his children to the ski areas in the Poconos. These activities had a substantial monetary value. The verdict of $405,000.00 would not seem excessive under the wrongful death action and undoubtedly was so intended by the jury. *DeSimone v. Philadelphia*, 380 Pa. 137, 110 A.2d 431 (1955). We agree with the court below that the jury inadvertently reversed the answers to the questions they were to decide and that the mistake can be remedied by aligning the answers with the proper questions. We reject the appellant's contention that the jury ignored or disregarded the trial judge's instructions. There is nothing to indicate that the jury failed to follow instructions in calculating the damages.

58

Appellant relies entirely upon the decision in *Magill v. Westinghouse Electric Corp.*, 464 F.2d 294 (3rd Cir.). There the jury reversed findings in wrongful death and survival actions and appellant argued the jury ignored instructions and the verdict was excessive. The lower court recognized the mistake but held the total verdicts were not excessive. The Third Circuit Court of Appeals reversed on the ground that the jury had not followed the court's instructions. But in a more recent case, *Vizzini v. Ford Motor Co.*, 72 F.R.D. 132, 139 (D.C.1976), the district court found that the jury's mistake in reversing answers to questions must be considered as harmless error. On appeal the Circuit Court, (569 F.2d 754 U. 976) while reversing on other grounds, did not disturb the harmless error holding. *Magill*, today, does not have the persuasion the appellant ascribes to it.

We think that where the total of the verdicts returned by a jury in a death action are not excessive, the fact that the jury made a mistake and awarded the smaller amount of the verdict to the wrongful death action and the larger amount of the verdict to the survival action so that one is inadequate and the other excessive and there is nothing else to indicate the jury failed to follow the court's instructions, the law of this Commonwealth is that the mistake should be corrected to avoid another and unnecessary trial.

Our Supreme Court has held that the mistake by a jury in assigning amounts of a verdict to the wrong survival and wrongful death claims is not a ground for a new trial. *Siidekum v. Animal Rescue League*, 353 Pa. 408, 45 A.2d 59 (1946). In *Siidekum*, the holding was based on a finding that the distribution of the total would be the same regardless of the apportionment of the award between the survival and wrongful actions. Here the decedent died intestate leaving a widow and three children. The widow would be entitled to one-third of the recovery in both survival and wrongful death actions. The balance would be equally divided among the children. In *Smith v. Philadelphia Transportation Company*, 173 F.2d 721, 727 (3rd Cir. 1949) where

the jury also reversed the survival and wrongful death awards the court stated: "In this situation we think that the jury reversed its answers to interrogatories 6 and 7. The mistake is easily remedied by setting the answers opposite the proper questions. . . . we note that the Pennsylvania Supreme Court has done exactly the same thing in a recent case," (citing *Siidekum*, supra). The error is harmless and the total effect is the same.

Judgment affirmed.

WIEAND, J., concurs in the result.