455 A.2d 1213

**Almeda B. SLASEMAN, Administratrix of the Estate of James Slaseman, Deceased, Appellant,**

v.

**Kathryn M. MYERS.**

Superior Court of Pennsylvania.

Argued June 24, 1981.

Filed Jan. 21, 1983.

538

William B. Anstine, Jr., York, for appellant.

Frank J. Goldenberg, York, for appellee.

Before PRICE, JOHNSON and SHERTZ.

JOHNSON, Judge:

The order appealed from in this case dismissed the plaintiff/appellant's exceptions and ordered entry of judgment [1] in favor of the plaintiff/appellant in the amount of $11,-234.51 in her wrongful death action, and in the amount of $128,173.77 in her survival action against the defendant.

Appellant presents us with four questions: (1) What is the function of a reviewing court where a judge sitting without a jury has failed to make specific findings? (2) Was the verdict inadequate? (3) Did the trial court err in not making specific findings of fact? (4) Should the trial

---

1. In its initial order dismissing the exceptions, *Slaseman v. Myers*, No. 77–S 3409, Civil Action Law (C.P. York County, order filed December 7, 1978), the court omitted to direct the entry of judgment. The plaintiff appealed to this court, which appeal was docketed at No. 256 March Term, Harrisburg, 1978. Because judgment was not entered prior to that appeal, however, the superior court per curiam quashed the appeal in an order filed January 16, 1981. 285 Pa.Super. 167, 427 A.2d 165. The trial court subsequently ordered entry of judgment on March 15, 1981. It is from that final order that plaintiff/appellant appeals to this court.

court have applied the rule of *Kaczkowski v. Bolubasz*, 491 Pa. 571, 421 A.2d 1027 (1980), to the case before ordering the entry of final judgment? (*See* note 1 *supra.*) Appellant asks this court to make an independent finding that the verdict should be at least $340,000.00 and to instruct the trial court to enter such a verdict accordingly.

The verdict of the trial court after the two day non-jury trial found the defendant/appellee negligent, which negligence it found to be the cause of the death of the decedent husband; it found the decedent non-negligent; and it rendered the verdict as indicated above. The verdict did not contain any special findings of fact.

■■■ Our supreme court has said that where the decision in a non-jury trial is in the form of a naked verdict without findings of fact, the appellate court must make an independent review of the record. *Lewkowicz v. Blumish*, 442 Pa. 369, 275 A.2d 69 (1971) (action in equity to quiet title); *Exton Drive-In, Inc. v. Home Indemnity Co.*, 436 Pa. 480, 261 A.2d 319 (1969), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970) (assumpsit action brought at a time when the applicable statute [2] provided that a non-jury court need not state findings of fact unless requested by counsel). This we shall do. However, the scope of our review is limited to whether the trial court's findings of fact are supported by competent evidence and whether or not the lower court committed an error of law. *E.I. duPont de Nemours & Co. v. Berm Studios, Inc.*, 211 Pa.Super. 352, 236 A.2d 555 (1967).

■■■ Similarly, where the issue raised on appeal is the inadequacy of the verdict, the "injustice of the verdict should stand forth like a beacon." *Elza v. Chovan*, 396 Pa. 112, 118, 152 A.2d 238, 241 (1959). A verdict is set aside as

---

**2.** Act of April 22, 1874, P.L. 109, § 2, as amended; 12 P.S. § 689 (Purdon 1953), repealed by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a) [634], effective June 27, 1980. The current rule, Pennsylvania Rule of Civil Procedure 1038, however, merely provides that the trial judge may, if he wishes, include as part of the decision specific findings of fact. Pa.R.C.P. 1038(b), 42 Pa.C.S.A. (Purdon 1975).

inadequate when it is so inadequate as to indicate passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff. *Dougherty v. Sadsbury Township*, 299 Pa. Super. 357, 445 A.2d 793 (1982); *Rutter v. Morris*, 212 Pa.Super. 466, 243 A.2d 140 (1968). If the verdict bears a reasonable resemblance to the damages proved, the appellate court will not disturb the verdict merely because the damages are less than the reviewing court might have awarded. *Id.*

The facts of this case, gleaned from a careful review of the record and of the trial transcript, are as follows. At twelve noon on June 20, 1977, plaintiff/appellant's husband, James Slaseman, was riding his motorcycle north on a highway in York County. He was wearing a helmet and had his headlights on. Defendant/appellee Kathryn Myers was riding in her automobile in the opposite direction. At an intersection Myers turned left from her lane into the path of the oncoming motorcycle. The road was clear, straight and dry. The motorcycle collided with the car, and Slaseman was thrown off the motorcycle, over the cars and into the southbound lane, where he landed on the highway. Within minutes there were emergency services people at the scene, but Slaseman was pronounced dead at the hospital an hour later. His death was caused by severe skull fractures. He also suffered a compound fracture in the arm, an injured knee, and contusions and abrasions all over his body. A witness to the accident testified that immediately after landing in the road Slaseman tried to get up, but was unable to. His eyes were open. He was bleeding profusely. His arm was twisted and bleeding heavily. The witness testified that she spoke to Slaseman, as did a bystander, in an attempt to comfort him, and that he responded by lying back down as they suggested.

The ambulance attendant, a registered nurse, arrived on the scene some minutes later. At trial she testified that Slaseman's behavior when she attempted to treat him as he lay in the road was that of a conscious person—moaning,

breathing rapidly, yet calming down when touched or spoken to. N.T. at 34. She further testified that she attempted chiefly to make an open airway but was unable to open his mouth in order to do so until he "relaxed much more on the way in the ambulance." N.T. at 36.

The police officer who reached the scene very shortly after the accident testified as to the accident scene, the position and condition of the vehicles, and the condition of the road. On cross-examination, however, he expressed the view that Slaseman was unconscious after the accident. N.T. at 13–14. The coroner who examined Slaseman's body after death stated that the skull fractures he suffered would have rendered him unconscious. N.T. at 60.

Slaseman's physician, an osteopath, testified to Slaseman's physical strength and excellent health. Slaseman was 55 years old at the time of his death. Slaseman neither smoked nor drank and had no physical ailment of any kind. There was also some testimony as to the longevity of his family. Based on government actuarial tables, Slaseman's life expectancy was another twenty years. The physician testified that Slaseman was a "better than average candidate for longevity because of his physical condition and background." N.T. at 52–53.

An accountant, the comptroller for Slaseman's employer, testified that Slaseman worked as a night terminal supervisor for a trucking company. He was in the top three out of fifteen in seniority. He was considered a good worker and much liked by his co-workers. In the year of his death he would have earned $19,888.68. He had enjoyed regular raises each year. He was a member of a union and his contract was negotiated as part of the union contract. The company comptroller testified that he would have averaged pay raises of 6% over each of the next ten years, should he have retired at age 65, or over each of the next fifteen years, should he have retired at age 70.

There was testimony from the union business agent as to the pension Slaseman would have earned if he had worked to retirement age. There was also testimony as to the fringe benefits to which Slaseman was entitled as a union

worker, specifically "health and welfare, which is eye, dental, prescriptions, office calls, major medical." N.T. at 130. "All his health and welfare ... benefits would apply to his family up until if he had a child 18 or 19, or unless they were going to college, and then they would be covered until they are 23 ... His wife also." N.T. at 131. None of these benefits continues after the death. N.T. at 143.

Slaseman was married. Until 1978 his wife worked as a sewing machine operator, but because of arthritis she has been forced to stop working. There were four children to the marriage, two of whom were living at home at the time of the accident, a son working, a daughter going to a training school. Since the accident the daughter lives at home and works, the son travels and returns home intermittently.

Before his untimely death Slaseman worked the night shift. During the day he worked in the family garden, growing vegetables and fruit trees. The family testified that he spent about 39 hours a week working in the house and yard, and helping his wife with chores and errands. Their free time was spent camping or fishing. The family members testified to the affectionate, considerate relationship between Mr. and Mrs. Slaseman, and to the supportive and instructive time spent between father and children.

An actuary testified as to the damages caused to his family by Slaseman's death, based on the figures with which he was provided, and on the various U.S. government tables regularly used by actuaries for such calculations. The actuary calculated the past lost earnings (from date of death till trial) as $22,193.00 less the cost of maintenance, leaving $18,713.00. N.T. at 206. For the future lost earnings he made calculations based on Slaseman's working either till age 65 or till age 70. Up to age 65 the future earnings, less cost of maintenance of $3,000.00 per annum, based on the figure estimated by the family as well as on the life tables, reduced to present value, was $140,001.00. Up to age 70, the present value of the future lost earnings less personal maintenance was $237,336.00. N.T. at 210. The net figure for past and future lost earnings was $158,-

714.00 up to age 65, and $256,049.00 up to age 70. N.T. at 211. The value of the lost pension was calculated to be $59,826.00 for age 65, and $34,462.00 for age 70. N.T. at 211–12. The actuary also calculated the lost Social Security benefits—after retirement at 65, these would be $38,914.00, and after retirement at age 70, these would be $19,480.00. N.T. at 213–14. The actuary then showed the cost to the employer of providing the fringe benefits Slaseman enjoyed, which was currently $1,539.00. N.T. at 215. Based on that figure the actuary calculated the value of the lost fringe benefits up to age 65 to be $11,504.00, and up to age 70 to be $16,152.00.

The actuary also calculated the value to the family of the services which Slaseman performed. He used the number of hours spent, as provided by the family, and the various current rates of pay in that geographical area for those tasks. Reduced to present value and counting for nineteen further years, based on Slaseman's life expectancy, the figure was $90,340.00. N.T. at 218.

The actuary further provided the court with a straight line calculation of lost future earnings, which he considered to be unrealistic. A straight-line calculation involves no increase in pay or in cost of personal maintenance. Up to age 65 this figure was $133,542.00, and up to age 70 this figure was $187,939.00, in lost future earnings. N.T. at 220–21.

The actuary stated that he made no calculation for inflation, and considered the specific earning potential rather than general economic trends in making the calculations in this case.

Other than estimating her husband's personal maintenance costs as having been $3,000.00 per annum, Mrs. Slaseman testified that her husband used to give her his pay check, which she deposited in the bank, and from which she would give him ten or twenty dollars in spending money. N.T. at 109–10.

■ The rule in Pennsylvania is that in survival actions the measure of damages is the decedent's pain and suffer-

ing and loss of gross earning power from the date of injury until death, and the loss of his earning power, less personal maintenance expenses, from the time of death through his estimated working life-span. *Incollingo v. Ewing*, 444 Pa. 263, 309, 282 A.2d 206, 229 (1971); [3] *Prince v. Adams*, 229 Pa.Super. 150, 324 A.2d 358 (1974).

Damages for wrongful death are the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death. The Wrongful Death Statute, 42 Pa.C.S.A. § 8301 (Purdon Pamp.1982), compensates the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death. *Sinn v. Burd*, 486 Pa. 146, 151 n. 3, 404 A.2d 672, 675 n. 3 (1979). This includes the value of services the victim would have rendered to his family if he had lived. *Heffner v. Allstate Insurance Co.*, 265 Pa.Super. 181, 401 A.2d 1160 (1979), *aff'd*, 491 Pa. 447, 421 A.2d 629 (1980).

In this case the trial court awarded $128,173.77 in the survival action, and $11,234.51 in the wrongful death action. Of the latter award, $3,234.51 compensated the funeral and administration expenses, leaving $8,000.00 as the amount of pecuniary loss to Mrs. Slaseman because of her husband's death.

Because of the absence of specific findings by the trial court we do not know if the court awarded any amount for conscious pain and suffering. In *Gallagher v. Four Winds*

---

**3.** At the time of trial Pennsylvania courts still followed the rule that the damages were to be reduced to present value. *See Incollingo v. Ewing, supra.* This rule was abandoned in *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980). In *Kaczkowski* our supreme court decided that the Pennsylvania rule, which involved ignoring inflation and productivity, and yet reducing lump sum awards to their present value, ignored the courts' responsibility to attempt to graduate the amount of damage award exactly to the extent of the loss. 491 Pa. at 571, 421 A.2d at 1032. The supreme court therefore ruled that henceforth "damages will be awarded for lost future earnings that compensate the victim to the full extent of the injury sustained. Upon proper foundation, the court shall consider the victim's lost future productivity.... [F]uture inflation shall be presumed equal to future interest rates with these factors offsetting. Thus, the courts ... are instructed to abandon the practice of discounting lost future earnings." 491 Pa. at 583, 421 A.2d at 1038–39.

*Motel-Hotel,* 233 Pa.Super. 1, 6, 335 A.2d 394, 397 (1975), this court stated that it is a matter of judgment as to what will fairly compensate a plaintiff or the estate for the pain and suffering endured, but that a failure to award any amount for pain and suffering is a strong indication that the verdict is inadequate. In the case before us, there was testimony from three witnesses, including the registered nurse who tended Slaseman at the scene, which would tend to show that he was conscious and in pain. One witness to the accident testified to talking to Slaseman, telling him to lie still; she testified that he looked at the bystanders who were trying to help him. In the witness's words, "His arm was all twisted and turned, and bleeding badly, his face was very gray, like he was in shock, and he was bleeding from the head and from the nose." N.T. at 23. A second witness to the accident testified that after landing on the road Slaseman "tried to raise up and then he laid back down." N.T. at 29. The registered nurse on the ambulance crew testified as follows:

> When I arrived, Mr. Slaseman was lying on the ground. At this point I cannot really tell you which side he was lying on, but I do remember that his right arm had a compound fracture with both bones showing in the forearm. As a matter of fact, the arm in layman's terms was torn off. Also, there were multiple cuts I would say, and the left side of his head was extremely mushy. There was a lot of bleeding. The blood was running down across his face and down his head. It was very hard to distinguish if there were a lot of cuts. I don't remember, actually remember applying pressures. There were massive abrasions on the left side of his head. I found the open fracture. I think probably the thing that caught my eye the the most was this gentleman was not really breathing adequately, because his color was extremely blue.

> .    .    .    .    .

> Okay, he wasn't conscious in the sense that he talked to me or there was any gross movement. By what I know in my background, I would say yes, he was conscious in

the sense that there was a moaning, he was restless not in the sense that he was flailing himself, but his breathing was extremely heavy and labored. I don't feel this is due to the fact that he was obstructed. It was more due to the fact—anyone knows when you are excited you're breathing rapidly, and it was this type of thing when you talk to him, he calmed down; when you touched him, and talked to him he calmed down.

N.T. at 33–34.

There was contradictory testimony from the police officer who testified in detail to the position and condition of the vehicles and merely stated on cross-examination by defense counsel that Slaseman was not conscious, and from the coroner who stated that the injuries Slaseman received would have rendered him unconscious. From this conflicting testimony, however, we find there is sufficient evidence to believe that Slaseman was conscious, despite his very severe injuries, at least until he was in the ambulance on the way to the hospital.

In addition to an absence of findings on pain and suffering, there is no information by the trial court as to which evidence it relied on to decide the amount of the verdict. There are statements in the opinion by the trial court, for the court en banc dismissing plaintiff/appellant's exceptions,[4] to the effect that a fact finder does not have to believe the testimony, even uncontradicted,[5] of the witnesses. The court also stated[6] that there was no testimony concerning the amount contributed by the decedent to his family, or to the amount of money which he gave to his children. While we agree that there was no cash figure as to what money he gave the children, we disagree that the evidence does not indicate how much of his salary went to his family or at least to those living with him, wife and

4. *Slaseman v. Myers,* No. 77–S–3409, slip op. at 4 (C.P. York County, December 7, 1978).

5. There was no contradiction to any of the testimony as to monetary amounts in this trial.

6. Slip op. at 3–4.

daughter. The wife managed the money, and gave him an allowance. He was apparently not profligate. The court could have deduced that the bulk of his earnings went to the support of the family for shelter, food, clothing, education and recreation. *Compare Buchecker v. Reading Co.,* 271 Pa.Super. 35, 412 A.2d 147 (1979).[7]

There was uncontradicted testimony from the actuary, who provided the court with alternatives depending on the age at which Slaseman would have retired, which consisted of figures for lost earnings, lost pension, lost social security benefits, lost fringe benefits and loss of value of services provided:

Lost earnings until age 65—$158,714.00

Lost earnings until age 70—$256,049.00

Lost pension (retirement at 65)—$59,826.00

Lost pension (retirement at 70)—$34,462.00

Lost social security benefits (retirement at 65)—$38,914.00

Lost social security benefits (retirement at 70)—$19,480.00

Cost to employer of fringe benefits (retirement at 65)—$11,504.00

Cost to employer of fringe benefits (retirement at 70)—$16,152.00

7. In *Buchecker* this court, WIEAND, J., concurring in the result, said:
   In the wrongful death action, the bulk of decedent's net earnings of $373,599.00 would have gone to the support of his family for shelter, food, clothing, medical care, education and recreation. Appellee was entitled to recover the loss of such support in the wrongful death action. Appellee was entitled to recover for the value of services, society and comfort the family would have received had decedent lived. The evidence set forth loss of services in guidance, tutelage, and moral upbringing decedent provided for his children. Decedent provided recreation for his family in the form of bowling, attending amusement parks, theaters, picnics and similar recreational activities. Decedent worked fixing his home, made a train and gymnasium for the children and played games with them. He took them on trips to New York, Philadelphia and the Jersey Shore. In the cities they visited the zoos and museums. In season, he took his children to the ski areas in the Poconos. These activities had a substantial monetary value.
   271 Pa.Super. at 57, 412 A.2d at 158.

Value of services to family (for life-expectancy)—$90,-340.00

We see no reasonable relation between the total amount awarded and the amount of damages proved.

The wrongful death verdict was for $11,234.51, $3,234.51 of which was the expenses caused by the death. This leaves an amount of eight thousand dollars compensating this widow for the loss of a husband who had a projected life span of at least twenty years, and a working life-span of ten to fifteen years, where at the time of death his union-negotiated salary was over $19,000.00 per annum.

■ Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation. The widow is also entitled to the pecuniary value of the services, society and comfort she would have received from the decedent. *Spangler v. Helm's New York-Pittsburgh Motor Express*, 396 Pa. 482, 485, 153 A.2d 490, 492 (1959).

■ The uncontradicted testimony in the transcript describes a close-knit couple, where the husband gave his pay check to his wife and spent about $3,000.00 per annum on himself. It also describes the amount of work done in the garden and around the house, on which the actuary placed a value. We are shocked that the court rendered a verdict of only eight thousand dollars to compensate the widow where the figures for lost earnings and the value of services rendered amount to at least $158,000.00 and $90,-000.00 respectively, disregarding the value to the widow of the pension, social security and fringe benefits, and disregarding also the loss of society and comfort.

The survival act verdict was $128,173.77. This was compensation to the estate, presumably for the loss of net earnings, the loss of pension, social security and fringe benefits to the decedent himself, as well as compensation for his conscious pain and suffering while he lay in the road

after the accident. Again we see no relation between the verdict awarded by the court and amount of the loss to the estate as calculated by the actuary, particularly in view of the fact that the lower court considered, with respect to the wrongful death action, that the evidence was insufficient to show that Slaseman contributed to the support of his wife. Slip op. at 3. The lower amount of net lost earnings alone is greater than the sum awarded, leaving no allowance for the other compensable items.

We therefore vacate the verdict as inadequate and remand to the trial court for the issuance of a new verdict based on the evidence presented at the trial. The trial court shall consider all the required elements of damages for wrongful death and survival actions for which there was evidence presented. *See, e.g., Pennsylvania Suggested Standard Civil Jury Instructions* (1981) and subcommittee Notes thereto. Because the testimony at trial provides the court with calculations with and without the reduction to present value, the rule of *Kaczkowski v. Bolubasz, supra* note 3, shall be applied, in order that Slaseman's family may be compensated to the full extent of the loss they have sustained, yet not receive any double recovery, *see Pezzulli v. D'Ambrosia,* 344 Pa. 643, 26 A.2d 659 (1942).

Jurisdiction is not retained. The parties will have the right to appeal from the new verdict.